# IN THE SUPREME COURT, STATE OF WYOMING

## 2022 WY 18

**OCTOBER TERM, A.D. 2021**

February 2, 2022

BOARD OF PROFESSIONAL
RESPONSIBILITY, WYOMING
STATE BAR,

Petitioner,

v.

D-21-0003

BECKET BENEDICT HINCKLEY,
WSB #6-3434,

Respondent.

*Original Proceeding for Attorney Discipline*

***Representing Petitioner:***
Mark W. Gifford, Bar Counsel, Wyoming State Bar.

***Representing Respondent:***
Stephen H. Kline, Cheyenne, Wyoming.

***Before FOX, C.J., and DAVIS\* \*\*, KAUTZ, BOOMGAARDEN, and GRAY, JJ.***

***KAUTZ., J., delivers the opinion of the Court; FOX, C.J., files an opinion concurring in part and dissenting in part, in which DAVIS, J., joins.***

*\* Chief Justice at time of review and consideration.*

*\*\*Justice Davis retired from judicial office effective January 16, 2022, and, pursuant to Article 5, § 5 of the Wyoming Constitution and Wyo. Stat. Ann. § 5-1-106(f) (LexisNexis 2021), he was reassigned to act on this matter on January 18, 2022.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KAUTZ, Justice.**

[¶1]    The Wyoming State Bar (Bar) charged attorney Becket Benedict Hinckley (Mr. Hinckley) with violations of the Wyoming Rules of Professional Conduct for Attorneys at Law (Rule or Rules).  A hearing panel from the Bar's Board of Professional Responsibility (BPR) conducted a hearing and submitted a Report and Recommendation for Disbarment pursuant to Wyoming Rule of Disciplinary Procedure (W.R.D.P.) 15(b)(3)(F).

## JURISDICTION AND STANDARD OF REVIEW

[¶2]    Wyoming statutes charge this Court with adopting rules establishing "practice and procedure for disciplining, suspending, and disbarring attorneys."  Wyo. Stat. Ann. § 5-2-118(a)(iii) (LexisNexis 2021).  Disciplinary proceedings are "necessarily incident to the inherent power of courts to control properly their own affairs."  *State Bd. of Law Examiners v. Brown,* 53 Wyo. 42, 49, 77 P.2d 626, 628 (1938).  As a result, this Court has "the power, the duty, and the corresponding jurisdiction to supervise the conduct of all Wyoming attorneys, each of whom is an officer of the court."  *Meyer v. Norman*, 780 P.2d 283, 288 (Wyo. 1989).

[¶3]    "The purposes of the state bar disciplinary procedures are to maintain the integrity of the bar, to prevent the transgressions of an individual lawyer from bringing its image into disrepute and to protect the public and the administration of justice."  *Bd. of Pro. Responsibility v. Richard,* 2014 WY 98, ¶ 51, 335 P.3d 1036, 1051 (Wyo. 2014) (citations and quotation marks omitted).  *See also, ABA Standards for Imposing Lawyer Sanctions* § 1.1 (ABA Standards).  In disciplinary proceedings, the responsibility of this Court is not to punish, but to inquire into and gauge a lawyer's continued fitness to practice law.  This inquiry is conducted with a view to safeguarding the interests of the public, the courts, and the legal profession.  *See* ABA Standards, Methodology ("The purpose of the disciplinary proceeding is not punitive but to inquire into the fitness of the lawyer to continue in that capacity for the protection of the public, the courts, and the legal profession.");  *State ex rel. Okla. Bar Ass'n v. Wintory*, 2015 OK 25, ¶ 15, 350 P.3d 131, 135 (Okla. 2015) ("The purpose of lawyer discipline proceedings is to protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely to properly discharge their professional duties to clients, the public, the legal system, and the legal profession.").  To this end, the Wyoming Supreme Court adopts and promulgates rules governing the professional conduct of attorneys, organizing the bar association, and establishing the procedure for attorney discipline.  *See Bd. of Pro. Responsibility v. Custis,* 2015 WY 59, ¶ 18, 348 P.3d 823, 828 (Wyo. 2015) (citing § 5-2-118).

[¶4]    The Bar, through its Bar Counsel, initiates attorney disciplinary proceedings by filing charges with the BPR.  W.R.D.P. 13(a).  The BPR then appoints a hearing panel to conduct a hearing and issue a report to this Court.  W.R.D.P. 15(a)(2) ("Upon the filing of a formal charge, . . . the BPR Clerk (in consultation with the BPR Chair) shall appoint a

Hearing Panel of three members of the BPR, two of whom shall be attorneys and one of whom shall be a non-attorney, for purposes of a hearing in the matter."); W.R.D.P. 15(b)(3)(F) ("If the Hearing Panel finds the charges have been proved by clear and convincing evidence and that public censure, suspension or disbarment is warranted, it shall issue a report and recommendation with its findings of fact, conclusions of law, and recommended discipline and file such report with the clerk of the Court."). When, as here, we receive such a report, W.R.D.P. 16(b) provides our standard of review: "The Court will give due consideration to the findings and recommendations of the Hearing Panel, but the ultimate judgment in proceedings under these rules is vested in the Court. Accordingly, the Court will examine the evidence, make findings, determine whether there has been an infraction of the Wyoming Rules of Professional Conduct, and impose the discipline which the Court considers appropriate." The Bar must prove violations of the Rules of Professional Conduct by clear and convincing evidence. W.R.D.P. 15(b). "The Court conducts a *de novo* review of all aspects of attorney discipline." *Custis,* ¶ 36, 348 P.3d at 832. Because the Court conducts a de novo determination in attorney discipline cases, it should not "adopt" BPR reports but make its own findings based on the record. We bear the ultimate responsibility for deciding whether misconduct has occurred and, if so, what discipline is warranted. Neither the BPR's findings of fact nor its view of the evidence or the credibility of witnesses binds this Court, although we give due consideration to those findings, if any. The same is true when the parties stipulate to misconduct and a recommendation for discipline. *See State ex rel. Okla. Bar Ass'n v. Moon*, 2012 OK 77, ¶ 6, 295 P.3d 1, 5 (Okla. 2012).

[¶5]    The BPR's "Report and Recommendation" contains numerous findings of fact and conclusions of law. Some of those are supported by clear and convincing evidence, while some are not. Some are relevant to the charges; others are not. The Report and Recommendation of the BPR contains no legal analysis of the applicable Rules, nor does it specify which facts, if any, supported its findings. It contains no findings or comment on credibility. Our ability to give due consideration to the BPR's findings and conclusions is hampered by the report's lack of a detailed legal analysis linking the rules, applicable law, findings and legal conclusions, as we have done herein. Our preference is that future reports provide this type of analysis.

## STATEMENT OF THE CASE

**Charges**

[¶6]    Mr. Hinckley was a prosecutor in the Teton County and Prosecuting Attorney's Office. The Bar filed formal charges (in a document titled Amended Formal Charge) against Mr. Hinckley accusing him of violating the Wyoming Rules of Professional Conduct while prosecuting Joshua Black (Mr. Black) for aggravated assault and battery of Mr. Black's girlfriend, Kelly Windsor-Denin (Ms. Windsor). The Bar's allegations against Mr. Hinckley were as follows:

2

      a.      Violation of Rule 1.3 by

            i.      "failing to file a response to defendant's motion to compel;"

            ii.      "failing to file a response to defendant's motion to restrict testimony;"

            iii.      "failing to comply with the [trial] [c]ourt's deadline for filing witness and exhibit lists and jury instructions;"

            iv.      [b]eing "chronically late in responding to motions;" and

            v.      "failing to perform an adequate investigation regarding the availability of Facebook and Verizon records before he made representations on those subjects to the [trial] [c]ourt."

      b.      Violation of Rule 3.2 by "failing to seek production of the victim's Verizon and Facebook records as ordered by the [trial] [c]ourt."

      c.      Violation of Rule 3.3(a) by "misrepresenting the extent of his efforts to obtain the Verizon and Facebook records."

      d.      Violation of Rule 3.4(c) by

            i.      "failing to comply with the [trial] [c]ourt's order granting defendant's motion to compel;" and

            ii.      "making inappropriate and prejudicial arguments during the trial."

      e.      "Violation of Rule 3.6(a) by disseminating a letter … to the (press)."

      f.      Violation of Rule 3.8 by "failure to take immediate action to preserve the Verizon and Facebook records."

      g.      Violation of Rule 3.8(e) by "dissemination of the letter to the (press)."

      h.      Violation of Rule 5.3 by "failure to confirm that law enforcement sent timely preservation letters to Verizon and Facebook."

      i.      Violation of Rule 8.4(d) by "conduct as set forth above (in the formal complaint)."

[¶7]    W.R.D.P. 13(a) states: "A disciplinary proceeding shall be initiated with the filing with the BPR Clerk of a formal charge which **shall set forth clearly and with particularity** the grounds for discipline with which the respondent is charged and the

3

conduct of the respondent which gave rise to those charges." (emphasis added). *See also, In re Ruffalo,* 390 U.S. 544, 550, 88 S.Ct. 1222, 1226, 20 L.Ed.2d 117 (1968) (a lawyer is entitled to procedural due process in a disciplinary proceeding, including fair notice of the charges and an opportunity to be heard); *Procedural Due Process Violations in Bar Disciplinary Proceedings,* 22 J.Leg.Pro. 351, 354-55 (1998) (an attorney's right to due process in a disciplinary action may be violated by a complaint "so vague as to deny the attorney notice of the underlying charges") (citations omitted).

[¶8]    The Colorado Supreme Court interpreted its corresponding disciplinary procedure rule as requiring the charge to "contain statements of both the disciplinary rules violated by the respondent and the facts underlying the violations." *People v. Richards,* 748 P.2d 341, 347 (Colo. 1987) (en banc).  This approach is consistent with the due process required whenever someone's property interest in his or her vocation is challenged.  *Cf. Slagle v. Wyo. St. Bd. of Nursing,* 954 P.2d 979, 982-83 (Wyo. 1998) (discussing the statutory and constitutional due process requirements that licensees be given notice of the "facts or conduct" which warrant interference with professional licenses).

[¶9]    It is important to focus on the specificity requirement in W.R.D.P. 13(a) at the outset of our analysis for several reasons.  First, this rule recognizes that all Wyoming attorneys have a due process right to be specifically notified of the rule or rules Bar Counsel claims were violated and of the alleged conduct which Bar Counsel claims violates the rule.  Second, the specificity requirement provides essential guidance for the BPR, and for this Court, when we review the accusations against the evidence.  The specificity requirement indicates that an attorney, including Mr. Hinckley, may only be found in violation of a rule on the basis of the specific facts claimed to constitute a violation.  Our rule and due process prohibit us from finding a violation of the rules on the bases of something not charged with particularity.  Finally, focusing on the rule of law involved and the specific application of that rule to the particular facts alleged assures that our decisions are applied consistently and are not dependent on whether there is something else about an attorney that the BPR or this Court likes or dislikes.

[¶10]  Mr. Hinckley answered the Amended Formal Charge by admitting he violated Rules 1.3, 3.2, and 8.4(d) as set out therein.  Mr. Hinckley specifically denied he violated Rule 3.8 by failing to take immediate action to preserve the Verizon and Facebook records and specifically denied his failure to confirm law enforcement took action to preserve the Verizon and Facebook records violated Rule 5.3.  He generally denied all other allegations.

[¶11]  In addition to his admissions in the answer, Mr. Hinckley admitted at the hearing that his inappropriate and prejudicial arguments at Mr. Black's trial were misconduct deserving sanctions under the Rules. *See Black v. State,* 2017 WY 135, ¶¶ 29-34, 405 P.3d 1045, 1053-54 (Wyo. 2017). His attorney admitted, in closing, that Mr. Hinckley knowingly violated Rule 3.4(c) when he failed to comply with the trial court's order to obtain the Facebook and Verizon records.

**General Facts**

[¶12] The evidence established the following general facts by clear and convincing evidence. Sometime on the night of October 26, 2014, Ms. Windsor was severely beaten. That night and into the next morning she sent text messages and cell phone photos of herself to others, identifying Mr. Black as the perpetrator. She was hospitalized for several days. At the scene, Ms. Windsor told a sheriff's deputy that she and Mr. Black had a fight during the night, that she had a hard time remembering specific details of the fight, and that, using her cell phone, she texted a photo of her injuries to others. At the scene, Mr. Black told Ms. Windsor's landlord that he and Ms. Windsor had been in a "tiff," he did not know what came over him, and he had never done something like that before. On October 28, 2014, a deputy interviewed Ms. Windsor at the hospital. Ms. Windsor had an incomplete memory of the night of October 26, remembering some time frames and events but not others. She related some specifics of the attack but did not remember other portions of the evening. Ms. Windsor looked at pictures on her cell phone and realized that "her timeline was off." The deputy obtained Ms. Windsor's cell phone and asked the sheriff's office IT department to "get me what you can off this phone." The IT department performed "forensic phone downloads," or a "phone dump," which resulted in "thousands of pages of phone downloads" and "probably a thousand pictures." The deputy then returned the phone to Ms. Windsor. Later, the deputy reviewed the extraction report and many of the photos on the phone and did not find anything she believed to be exculpatory. Ms. Windsor participated in another interview with the deputy at the sheriff's office on October 31, 2014. She related some memory of events on the night of October 26, but did not remember other portions.

[¶13] Mr. Hinckley was assigned the case on October 28, 2014, the same day law enforcement took Ms. Windsor's phone for the extraction. Mr. Hinckley filed an aggravated assault and battery charge against Mr. Black. Mr. Black's attorneys submitted demands for discovery under W.R.Cr.P. 16 and 26.2. According to Mr. Black's attorney, Mr. Hinckley provided "a substantial amount of discovery" but "only some evidence from [Ms. Windsor]'s Facebook and cell phone." At a hearing, Mr. Black's attorney limited the request to Facebook and Verizon records from June 1, 2014, through November 30, 2014. Mr. Hinckley generally indicated the State did not object to the demand for discovery. In an order entered August 12, 2015, based on Mr. Hinckley's consent, the trial court directed: "The State shall exercise due diligence to obtain the requested information and **shall promptly request the information from Facebook and Verizon Wireless** and provide it to Defendant's counsel." (emphasis added). Mr. Hinckley never requested the information from Facebook or Verizon. Other facts related to the trial court's order about the Facebook and Verizon records are set forth in the discussions on Rules 3.2, 3.3(a), and 3.4, below.

[¶14]  A jury found Mr. Black guilty.  He appealed, and this Court reversed, based on Mr. Hinckley's prosecutorial misconduct.  We found Mr. Hinckley committed prosecutorial misconduct in closing argument by (1) personally vouching for law enforcement officers involved in the case, (2) making remarks to inflame the passion of jurors rather than related to the facts, and (3) making a personal attack on defense counsel.  We also found Mr. Hinckley committed prosecutorial misconduct by failing to ever request the ordered information from Facebook or Verizon.

[¶15]  After remand, Mr. Hinckley again handled the prosecution of Mr. Black.  From January 11, 2018, when the trial court conducted a scheduling conference, until June 26, 2018, when Mr. Hinckley was removed as prosecutor on the case, he never requested the records from Facebook or Verizon.  Over the entire course of the prosecution, Mr. Hinckley made various statements to the trial court about his efforts in that regard, which are addressed in the discussions on Rules 3.3(a) and 3.4, below.

## DISCUSSION OF ALLEGED RULE VIOLATIONS

**Rule 1.3**

[¶16]  Although Mr. Hinckley generally admitted he violated Rule 1.3, the BPR specifically found clear and convincing evidence of numerous violations of the rule.  Rule 1.3 requires a lawyer to "act with reasonable diligence and promptness in representing a client."  The Amended Formal Charge alleged the following instances of misconduct as violations of Rule 1.3:  "failing to file a response to defendant's motion to compel"; "failing to file a response to defendant's motion to restrict testimony"; "failing to comply with the [trial] [c]ourt's deadline for filing witness and exhibit lists and jury instructions"; being "chronically late in responding to motions"; and "failing to perform an adequate investigation regarding the availability of Facebook and Verizon records before he made representations on those subjects to the [c]ourt."  Clear and convincing evidence establishes Mr. Hinckley violated Rule 1.3 in certain, but not all, respects.

[¶17]  The first Rule 1.3 violation alleged in the Amended Formal Charge was that Mr. Hinckley failed "to file a response to defendant's motion to compel."  The defense filed a motion to compel on July 8, 2015, seeking an order directing the State to obtain Ms. Windsor's Verizon and Facebook records.  Bar Counsel did not cite authority which required the State to respond in writing to the motion to compel, and we are not aware of any such requirement under the Rules of Criminal Procedure.  Pursuant to Wyoming Rule of Criminal Procedure (W.R.Cr.P.) 1(a), the Wyoming Rules of Civil Procedure (W.R.C.P.) govern if a procedure is not established in the criminal rules.  Under W.R.C.P. 6(c)(2) "a party affected by [a] motion **may** serve a response . . . at least three days prior to the hearing on the motion or within 20 days after service of the motion, whichever is earlier."  (emphasis added).  "As a general matter, the word 'may' when used in a statute,

6

is permissive." *Duke v. State,* 2009 WY 74, ¶ 34, 209 P.3d 563, 574 (Wyo. 2009) (citing *Mayor v. Bd. of Land Comm'rs,* 64 Wyo. 409, 192 P.2d 403, 411 (1948)). Of course, a case management or scheduling order can mandate a response or provide a different date for responses.[1] *See Carabajal v. State,* 2020 WY 104, ¶ 37, 469 P.3d 389, 399 (Wyo. 2020) (a district court may set filing deadlines in a case management order, and it is not acceptable for the State to ignore them); W.R.Cr.P. 12(d) ("the court may, at the time of the arraignment or as soon thereafter as practicable, set a time for the making of pretrial motions or requests"). Under the May 26, 2015, scheduling order, the parties were required to file pretrial motions at least 30 days before the pretrial hearing. The scheduling order did not mandate a response to any pretrial motions except motions in limine. Mr. Hinckley did not file a written response to Mr. Black's motion to compel; instead, he responded verbally at the hearing. The district court noted the lack of a written prosecution response but did not comment further on the matter. Mr. Black did not file any other motion specifically denominated as a motion to compel.

[¶18]   On May 1, 2018, Mr. Black filed "Defendant's Motion for Discovery." At the June 26, 2018, hearing on that motion, the district court refused to characterize that filing as a motion to compel under W.R.Cr.P. 16, stating it was "more like a request for discovery in a civil case." The court invited the defense to file an appropriate motion to compel if it was warranted, but Mr. Black did not do so. There is no showing Mr. Hinckley violated a mandatory requirement to file a response to Mr. Black's July 8, 2015, motion to compel – the only such motion in the record.

[¶19]   The second allegation of Rule 1.3 misconduct involved Mr. Hinckley's failure "to file a response to defendant's motion to restrict testimony." A revised scheduling order was entered by the district court on August 21, 2015. It required Mr. Black to file any remaining motions before 5 p.m. on August 27, 2015, and said, "the State may file responses [to such motions] before noon on September 4, 2015." Mr. Black filed a "Motion to Restrict Witness Testimony for Failure to Comply with Discovery and Court Order," seeking an order excluding testimony from Ms. Windsor and law enforcement as a sanction for the State's failure to comply with its discovery obligations. At the September 14, 2015, hearing on Mr. Black's motion, the district court noted the State had not filed a response. By using the permissive term "may," the scheduling order did not require the State to file a response to Mr. Black's motion to restrict testimony; it simply gave the State a deadline if it chose to do so. The record does not support a finding that Mr. Hinckley violated his duty of diligence by failing to file a response to Mr. Black's motion to restrict witness testimony.

---

[1] Although we recognize a case management or scheduling order may require written responses, such recognition does not establish that failure to file a response to a motion constitutes a default or waiver of objections. That issue is not presented in this case.

[¶20]   There is clear and convincing evidence Mr. Hinckley committed the third allegation of misconduct under Rule. 1.3 by "failing to comply with the [c]ourt's deadline for filing witness and exhibit lists and jury instructions." Mr. Hinckley admitted he did not file the State's list of witnesses and exhibits or proposed jury instructions in accordance with the district court's scheduling order. The district court admonished Mr. Hinckley for his failure to comply with the scheduling deadlines.

[¶21]   Bar Counsel presented clear and convincing evidence that Mr. Hinckley was "chronically late in responding to motions," the fourth alleged violation of Rule 1.3. After we reversed the conviction in *Black,* the district court entered scheduling orders which specifically addressed motions to compel and other discovery matters. In its January 16, 2018, scheduling order, the district court stated: "If either party files a written motion, the other party shall file a written response." The court issued an amended scheduling order on March 12, 2018. That order did not specifically require written responses to motions, but it stated responses and replies to motions "are due pursuant to the procedures and deadlines under W.R.C.P. 6(c)." The defense filed a motion for change of venue on April 26, 2018, and a motion for discovery on May 1, 2018. In a June 5, 2018, order setting a hearing on pending motions for June 26, 2018, the district court noted the State had not filed responses to Mr. Black's motion for change of venue and motion for discovery:

> Defendant is charged with offenses that may result in life in prison, the alleged offenses involve significant injuries sustained by the alleged Victim, and this case was already tried and remanded for a second trial. In the [c]ourt's first Scheduling Order issued after the remand the [c]ourt expressly ordered "If either party files a written motion, the other party **shall** file a written response. The [c]ourt will be reluctant to entertain positions expressed for the first time at a hearing on the motion. Such a practice invites error." Scheduling Order (Jan. 16, 2018) at ¶ Preamble(a) (emphasis added). The [c]ourt recognizes that the special provision was not incorporated into the Amended Scheduling Order entered March 12, 2018. The [c]ourt was optimistic that the proceeding on remand would reflect heightened attention to detail by all parties and an orderly resolution of pretrial matters. The filing of written responses was ordered and therefore was, and continues to be, expected.

(emphasis in original).

8

[¶22] Mr. Hinckley finally filed a response to the defense's discovery motion on June 14, 2018, and a response to the venue motion on June 19, 2018.[2] At the June 26, 2018, hearing on the motions, the defense asked that the State's response to the motion for change of venue be stricken and the "issue waived" because it was filed weeks after the deadline under W.R.C.P. 6(c)(2) ("a party affected by the motion may serve a response . . . at least three days prior to hearing on the motion or within 20 days after service of the motion, whichever is earlier"). In response, Mr. Hinckley stated that he "just forgot" to respond to the venue motion and had been "taken to the woodshed by [his] boss." The district court stated:

> So, the [c]ourt is concerned. And I have already noted the [c]ourt's concern in one of my last – it may have been the order setting this hearing, I believe it was. It's bad medicine not to respond to motions. And this [c]ourt even said at the beginning of this second proceeding that motions shall be responded to.
>
> It puts the [c]ourt – it handicaps the [c]ourt, number one, because it doesn't have a position from the State in advance of any hearing on motions. And, number two, it invites the opposing party to ask that those things not be considered and that sanctions be imposed. This is a big case, certainly a huge case to Mr. Black.
>
> And after a lengthy trial and over a year on appeal and change of [defense] counsel on the second trial and so a continuance. This, seems to me, should be at the top of the list for cases that are important to pay attention to and meet deadlines.

The court took the defense motion for change of venue and for sanctions under advisement.

[¶23] Mr. Hinckley acknowledged at the disciplinary hearing that he had been admonished by the court for failing to file timely responses to defense motions and conceded his conduct was "sloppy and negligent." His admission, together with the late responses to the two defense motions filed in April and May 2018, constitute clear and convincing evidence of lack of diligence. An attorney violates Rule 1.3 by conduct demonstrating "a patterned failure to comply with court rules and deadlines." *Bd. of Pro. Responsibility v. Abraham,* 2016 WY 66, 376 P.3d 483, 486 (Wyo. 2016). By failing to respond to motions in a timely fashion, Mr. Hinckley risked continuances and sanctions

---

[2] Mr. Black also filed a motion to dismiss and for sanctions on June 1, 2018. The State's June 21, 2018, response to that motion was timely as it was filed within 20 days of service. W.R.C.P. 6(c)(2).

9

against the State. When an attorney puts his client's interests in jeopardy by failing to meet court deadlines, he violates his duty of diligence under Rule 1.3. *See, e.g., Bd. of Pro. Responsibility v. McLaughlin*, 2006 WY 67, 136 P.3d 158, 159 (Wyo. 2006) (attorney violated Rule 1.3 by failing to respond to a suit, resulting in a default judgment against his clients); *Bd. of Pro. Responsibility v. Pearce,* 2019 WY 85, 446 P.3d 717, 720 (Wyo. 2019) (attorney violated Rule 1.3 by failing to comply with the court's filing deadlines).

[¶24] The dissent claims Mr. Hinckley violated the duty of diligence by failing to file responses to motions even though no rule or court order required him to do so and relies on the trial court's post-remand admonishment of Mr. Hinckley. Although the trial court expressed its concern that "it is bad medicine not to respond to motions," it also acknowledged that some of its own orders required written responses, while others did not. The fact that the trial court expressly ordered Mr. Hinckley to file written responses to some motions reflects that such responses are not automatically required by the rules. Furthermore, the trial court's statements about filing responses did not indicate any negative consequence to Mr. Hinckley's client as a result. Mr. Hinckley was able to fully present his client's position without written responses. The dissent argues that filing responses could have helped Mr. Hinckley prepare for the hearing on Mr. Black's motion to compel. The charge here is not that Mr. Hinckley violated Rule 1.3 by being unprepared. It is simply that he violated the rule by failing to file a written response. Absent a rule or court order requiring a response, Mr. Hinckley did not violate the duty of diligence by not filing what was not required. The dissent's approach creates a de facto rule that attorneys must file written responses to every motion or risk disciplinary sanction on that basis alone, even when, as recognized by the district court, there is no general requirement to do so.

[¶25] The BPR did not address the fifth allegation of misconduct under Rule 1.3, i.e., that Mr. Hinckley failed to "perform an adequate investigation regarding the availability of Facebook and Verizon records before he made representations on those subjects to the [c]ourt." Rule 15 anticipates that the BPR will either find that an allegation was not proven by clear and convincing evidence and dismiss the charge or find that it was proven by clear and convincing evidence and include findings about the charge in its report. The report here falls between those standards. However, Mr. Hinckley admitted this allegation in his answer. In this unique circumstance we will consider the allegation, although we prefer that reports address each allegation.

[¶26] Mr. Hinckley testified that, in hindsight, he was wrong in his understanding of what data was available from Facebook and Verizon and for how long. His own expert testified that Mr. Hinckley did not do enough to educate himself (although the expert did not connect this failure to the diligence requirement of Rule 1.3):

> Q:  Do you see anything in the record that would lead you to
> believe that Judge Day was misled about whether or not Mr.

10

Hinckley ever made any efforts to contact Facebook and Verizon himself?

A:   I don't think he was misled.   What I think is the whole discussion is affected by the lack of an accurate understanding of how this whole process works, whether it's on the part of the judge or the defense attorney or the prosecutor.

I think I told you before when I was talking to you, it reminds me of that old tale the blind man and the elephant, and they're each describing the part they feel.   And none of it, unfortunately, was really accurate.   I think if I blame Becket for one thing, it would be – Mr. Hinckley – it would be not reaching out to somebody like [an appropriate expert] or maybe his DCI folks or something like that and find out what the heck they could do before he went to that hearing and file a response in accordance.

Defense counsel provided Mr. Hinckley with information about how to preserve Facebook records, but that information did not explain whether deleted items could be recovered or how long they were retained in the absence of a preservation request.  Mr. Hinckley understood information he got from FBI Agent Jim Bonich to establish a ninety day cut-off, but in the context of the ongoing dispute, Mr. Hinckley should have investigated further before making representations to the court.  Clear and convincing evidence established that Mr. Hinckley failed to act with reasonable diligence in investigating the availability of Facebook and Verizon records before he made representations on those subjects to the court.

**Rule 3.2**

[¶27]  The Bar accused Mr. Hinckley of violating Rule 3.2 by failing to seek production of records from Facebook and Verizon as ordered by the court.  Although Rule 3.2 does not specifically address compliance with court orders, it requires a lawyer to "make reasonable efforts to expedite litigation consistent with the interests of the client."   Mr. Hinckley admitted this accusation in his answer.  The BPR found clear and convincing evidence Mr. Hinckley violated Rule 3.2 by failing to seek production of digital records as ordered by the district court and by "otherwise failing to make reasonable efforts to expedite litigation in the interest of his client, the State of Wyoming."

[¶28]  Mr. Black filed a "Motion to Compel the Discovery of Facebook and Cell Phone Records" on July 8, 2015.  The motion asked the trial court to direct the prosecutor's office to "immediately produce … texts, postings, responses, private messages, public messages, group chats, pictures, videos and the activity logs from [Ms. Windsor's] Facebook Account

11

and from her phone provider, Verizon Wireless." The motion was based on W.R.Cr.P. 16 and 26.2 and asserted that defense counsel had submitted a discovery request under those rules on May 15, 2015. Mr. Black argued the Facebook and Verizon records were necessary to his defense because the records obtained from the extraction of Ms. Windsor's phone may be inaccurate or certain information may have been deleted. Finally, the motion claimed, "it is much easier and more convenient for the State to obtain these … records than the Defendant." The district court heard that motion on August 7, 2015. Although the court recognized the motion did not fit well under the rules for criminal discovery, it asked the State whether it objected. Mr. Hinckley responded, "I just won't object. We'll just give them what we can …." After Mr. Black's counsel limited the time frame of the request, the court asked Mr. Hinckley, "So you're going to attempt to comply with that request to the extent that it's reasonably possible to do so?" Mr. Hinckley responded, "[A]bsolutely." After further discussion of the matter, Mr. Hinckley added, "We'll do the best we can to comply with that. … I have no idea what's exculpatory to them [the defense]. I have no idea what their defense is going to be. So I'll give them everything, everything possible. So there's no objection there, Judge."[3]

[¶29] Based on those statements, the district court issued a written order on August 12, 2015, which stated: "The State shall exercise due diligence to obtain the requested information **and shall promptly request that information from Facebook and Verizon Wireless** and provide it to Defendant's counsel." (emphasis added). The order did not define what would and would not constitute "due diligence," and did not establish a deadline for the State to request the information from Facebook and Verizon, but it required the State to make the request "promptly." To do something "promptly" is to accomplish it "without delay; very quickly or immediately." *Merriam-Webster.com.* The record shows during the ensuing 34 months, Mr. Hinckley never requested the information from Facebook or Verizon, nor did he direct someone else to request that information directly from Facebook or Verizon on behalf of the State.

[¶30] Clear and convincing evidence shows Mr. Hinckley failed to comply with the court's order. (See discussion of Rule 3.4(d), below). However, Rule 3.2 focuses on a lawyer's responsibility to expedite litigation as opposed to a focus on compliance with court orders. It states: "A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client." The rule turns on a lawyer's responsibility to recognize the interests of the lawyer's client, not necessarily the interests of opposing parties.

[¶31] As a prosecutor, Mr. Hinckley's client was the State. The State has an interest in efficient trial processes. Although the evidence did not show the trial had been continued

---

[3] We do not consider whether the State was required to comply with Mr. Black's request under W.R.Cr.P. 16 or 26, or under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The district court's order was based solely on the State's agreement to provide the requested information.

or delayed due to Mr. Hinckley's failure to obtain the digital records, his failure to timely obtain them caused expense to both sides, tied up the trial court with enforcement motions, and interfered with orderly preparation for trial. His failure to comply with the discovery order was contrary to his client's interest in expeditious litigation. *See Richard,* ¶¶ 61-62, 335 P.3d at 1054.

[¶32] Bar Counsel only alleged with particularity a violation of Rule 3.2 by failing to seek production of the victim's Verizon and Facebook records as ordered by the district court. The BPR's second ground for disciplining Mr. Hinckley stated that he had "otherwise" violated Rule 3.2. Disciplining an attorney for "otherwise" violating a rule without giving notice of the conduct which allegedly violated the rule is a violation of due process notice requirements. *Mendicino v. Whitchurch,* 565 P.2d 460, 474 (Wyo. 1977) ("in the interest of complete fairness respondent should have been formally charged with misconduct in this respect before it could be included as a separate item of misconduct against him") (citing *In re Ruffalo,* 390 U.S. at 550-51, 88 S.Ct. at 1226 (procedural due process demands the attorney in a disciplinary proceeding receive notice of the charges against him)).

[¶33] Nevertheless, we conclude Bar Counsel presented clear and convincing evidence Mr. Hinckley violated Rule 3.2 by failing to seek the Verizon and Facebook records in accordance with the district court's order. Mr. Hinckley admitted he failed numerous times to contact Verizon and Facebook to obtain the records, in violation of the district court's order, thereby interfering with the State's interests in expeditiously resolving criminal cases. *Richard,* ¶ 60, 336 P.3d at 1053-54 (respondent's failure to comply with the district court's order compelling discovery violated Rule 3.2).

**Rule 3.3(a)**

[¶34] The Bar's Amended Formal Charge alleged Mr. Hinckley violated Rule 3.3(a) by "misrepresenting the extent of his efforts to obtain the Verizon and Facebook records." That particular allegation contained no further specificity. In the narrative section of the Amended Formal Charge, the Bar quoted a footnote in a motion filed by Mr. Black's attorney which asserted the following statements were misrepresentations:

1. 8/20/15  "I did exactly what [the court] ordered me to do, but we don't have it."
2. 8/20/15  "I made the request of the entities that deal with it … So, if you order it, I'll give it another whirl."
3. 8/20/15  "But, again, if you order me Judge, I'll do the best I can."
4. 8/20/15  "I'll make another formal verbal request, that is what the judge ordered from the order."

5. 9/14/15 "So, when there are -- when there were discovery issues, obviously the State's done everything it can to try to remedy that."
6. 9/14/15 "Particularly considering counsel still wants phone and Facebook stuff, which we will leave and I will contact one of the deputies as soon as I leave here."
7. 9/16/15 (Statement by witness Mr. Hinckley called – Sheriff Whalen) "[Mr. Hinckley] mentioned that he contacted some representative of Facebook."
8. During Trial "I tried to do it … had office people try to do it. Had the FBI help me."
9. During Trial "We tried every way to get those deleted phantom messages."

Each of these statements occurred before Mr. Black's appeal and the remand. Although a better practice would have been to identify the factual statements alleged to be false with particularity in the allegations section of the Amended Formal Charges, we will review the above statements. Bar Counsel referred to these specific statements in his closing as the basis for the Rule 3.3(a) allegations. They are the only statements alleged by the Amended Formal Charges to violate Rule 3.3(a).

[¶35] The BPR found clear and convincing evidence that "Hinckley committed numerous violations of Rule 3.3(a) (false statements to a tribunal) in that he knowingly and repeatedly made false statements to Judge Day and knowingly and repeatedly failed to correct false statements previously made to the [c]ourt concerning his efforts to obtain the digital records." The BPR Report did not indicate which statements it found to be false or uncorrected by clear and convincing evidence. It did not provide any legal analysis of the application of Rule 3.3(a) to the facts.

[¶36] Rule 3.3(a) states: "A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." The requirement of honesty is foundational to our judicial system and to our society. "Our adversary system for the resolution of disputes rests on the unshakable foundation that truth is the object of the system's process which is designed for the purpose of dispensing justice. . . . Even the slightest accommodation of deceit or a lack of candor in any material respect quickly erodes the validity of the process." *In re Liotti*, 667 F.3d 419, 429 (4th Cir. 2011).

[¶37] The first half of this rule proscribes knowingly making a false statement of fact to the court. Rule 1.0(g) states "knowingly" "denotes actual knowledge of the fact in question." Actual knowledge is more than constructive knowledge. The "rule does not permit a violation based on constructive knowledge" or what the attorney "should have known." *In re Kline*, 298 Kan. 96, 125, 311 P.3d 321, 343 (2013).

14

[¶38]   In the criminal context, we recognize "the ordinary meaning of 'knowingly' is 'with awareness, deliberateness, or intention' as distinguished from inadvertently or involuntarily." *Butz v. State*, 2007 WY 152, ¶ 20, 167 P.3d 650, 655 (Wyo. 2007), *abrogated on other grounds by Granzer v. State*, 2008 WY 118, ¶ 20, 193 P.3d 266, 272 (Wyo. 2008).  That definition applies to "knowingly" as used in Rule 3.3(a)(1) as well. An attorney violates the rule only when clear and convincing evidence shows he provided false facts to the court with awareness of their falsity. *Att'y Grievance Comm'n of Md. v. Dore*, 433 Md. 685, 703, 73 A.3d 161, 171 (2013).

[¶39]   The second half of the rule requires an attorney who learns that facts he previously presented to the court were false to correct those facts if they are material.  The duty to "correct" arises only when an attorney knows that his prior factual statements were false, and they are material to the issue being considered by the court.

[¶40]   Additional factual background is necessary in evaluating the specific comments listed above as violations of Rule 3.3(a)(1).  At the August 7, 2015, hearing, after Mr. Hinkley agreed to Mr. Black's motion for discovery of Facebook and Verizon information, the trial court said, "And if there are further issues … if you think the Court should weigh in on and intervene on then that can be taken up well in advance of trial.  Is that a satisfactory resolution for now?"  Mr. Black's attorney recognized that Mr. Hinckley may have difficulties obtaining the requested material and said, "I would agree with Mr. Hinckley that there's a – the rule in caselaw often stated is there's a due diligence requirement on his part.  I don't believe that means that if he's told he can't get things or they don't exist that he's then left with some extraordinary responsibility to find something that's not out there.  But he does have a due diligence standard."

[¶41]   Thirteen days later (eight days after the court signed the order on August 12, 2015), the trial court held a hearing where Mr. Hinckley made the first four statements claimed to be untrue.  The context of those statements is essential.  Mr. Black's counsel indicated she had not received the Facebook and cell phone records from the State.

> Hinckley:  Your Honor, I don't want to get into this, but this is exactly what I talked about last time.  I was willing to go do what we can.  You said thank you.  I said I didn't want to be the gatekeeper.  And in your wonderful fashion you describe *Brady*, [373 U.S. 83, 83 S.Ct. 1194] and *Giglio* [*v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)] and my obligations, which I appreciate, which I don't like.  I don't like being the gatekeeper.  This is exactly what I thought would happen, exactly.  And I know [defense counsel's] doing her job.  She says there's exculpatory evidence there, she has no clue there's exculpatory evidence there.  She thinks there is

15

because her client told her that. Her client says there's got to be stuff on the victim's phone and on Facebook that have [sic] been erased that would show that somebody else was involved and the victim is [sic] therefore erased it and once I get it I'll be able to cross-examine the victim that somebody else was involved. That's called fishing.

That being said, what day was our last hearing? That day I went down, I wrote Kimmi an e-mail, the evidence tech, I believe I cc'd Sharon or maybe I forwarded it or cc'd her, not sure, and said here's what the Court told me to do.

We had a debate in my office with Steve, Clark, Terry, and myself about what the Court ordered when the order came out and what I said I would be willing to do. And I told my colleagues I said, Judge, "How far do we have to go? What's the State's obligation? Do we have to go back five years? Ten years?" [Defense counsel] can do the same thing. She can get those records just as easily as I can. Now she claims she can't, she has to go through a few extra steps, I don't know if that's true, I've never defended.

But I sent Kimmi that e-mail last Thursday, a week from today, we have a meeting, law enforcement meeting. I specifically asked, again, what about the phone records and Facebook. The first topic was Facebook. They looked at me like I had three heads, I mean they really did. Chad Sachse says call the F.B.I., call Jim Bonich. He can figure out Facebook. I thought okay that will help, at least I can go to the judge and say we tried that. And I want to be cautious here. Kimmi said to me she had talked to Todd Stanyon and Todd said we're not going to do that. I said, "Wait a minute." I said, "The judge told me we need to do that."

Her response was if we start doing this with every defendant who says it's our obligation, the State's or the S.O., to do their work, to go get stuff that they can get when it's not in our control they said that's all we would do. So they refused to do it.

So a debate ensued, Your Honor, in the law enforcement meeting. Clark and Terry and I said the judge has told us what to do so we're telling you what to do and that's the date it

16

unfolded. And it was actually kind of heated. I said, look, I don't know what else to do. I mean I don't know what kind of control I have over these people, but as of right now neither Facebook nor those cell phone records that have this so-called exculpatory evidence on it, that nobody has a clue if that's true, has not been obtained. So I don't know what to say, other than that.

[¶42] The district court then reviewed the August 12, 2015, order and commented on how it was developed from the August 7 hearing. In response, Mr. Hinckley said:

That states it absolutely accurately exactly what happened. I mean I don't contest that at all, Your Honor. **I did exactly what you ordered me to do, but we don't have it.** (emphasis added).

Later in that hearing, Mr. Hinckley focused again on the reluctance of the Sheriff's Office to obtain the Facebook and Verizon records, stating:

Am I supposed to go down there and beat the Sheriff over the head with a bat? I get that I'm the – they're an extension of my office, I totally get that. I'm just telling you the sequence of events of how they occurred. I would like to have this behind me because I think they're going to find out, regardless of what the defendant says, is there's nothing there. So I would like to tell you today here's the Facebook and here's the phone records … [statements about the phone extraction that was provided to Black]… So if your Honor wants me to go talk to Stanyon [from the Sheriff's office] with my boss and talk with the Sheriff I'm more than happy to do that. But counsel's right, we – **I made the request of the entities that deal with it.** I have zero investigative power. **So if you order it, I'll give it another whirl**. (emphasis added). … [statements unrelated to this issue] … So I would love to provide that information and show that it doesn't exist. **But, again, if you order me, Judge, I'll do the best I can**. (emphasis added).

Near the end of the pretrial conference on August 20, 2015, Mr. Hinckley volunteered an additional statement about the digital records:

One last thing, Judge, in regards to the discovery just for the record. I turned around and told all three of them so we can get it covered, that our first order of business is we're going to

17

leave here, I'm going to go downstairs to the S.O. **I'll make another formal verbal request, this is what the judge ordered from the order** previously, that's where we're starting. I'll make contact with the FBI myself. Jim Bonich with the FBI, he's been very helpful in past cases, I'll do that today. I'm going to go to my boss, we'll talk to Todd Stanyon and to the Sheriff if that's necessary. (emphasis added).

[¶43] The trial court set an additional pretrial conference for September 14, 2015, and required motions to be filed by August 27, 2015. Mr. Black's attorney filed a motion to sanction the State for failing to comply with the order of August 12, 2015, including failing to provide the Facebook and Verizon records. In response to the motion, Mr. Hinckley asserted that Verizon did not retain text messages for more than 90 days, and Facebook only retained information for 90 days. The trial court asked Mr. Hinckley, "[W]here does that information come from?" Mr. Hinckley responded, "[T]he FBI and the Sheriff's Office. I have not specifically called Verizon." He then said he "found out some [electronic] things had not been searched," and explained:

> But anyway, I ran over to the FBI's office and enlisted Jim Bonich's help who called the agent in charge of this region to get basically a permission letter to come and help out local law enforcement, I forget the name of it. All electronics were sent to this Rocky Mountain forensics place and that's who generated the report. **So when there are – when there were discovery issues, obviously the State's done everything it can to try to remedy that**. (emphasis added).

[¶44] Later in that same hearing, Mr. Black's counsel noted that Mr. Hinckley was raising objections to getting the Facebook and Verizon information after he originally agreed to do so. Apparently in response, Mr. Hinckley told the trial court:

> And there's one other issue that needs to be on the record, **particularly considering counsel still wants phone records and Facebook stuff, which we will leave and I will contact one of the deputies as soon as I leave here.** (emphasis added)

[¶45] With this factual background in mind, we will address each of Mr. Hinckley's alleged false statements, remembering that the rule prohibits knowingly making false statements of fact or law:

> 1. "I did exactly what [the court] ordered me to do, but we don't have it." When this statement is considered in context, there is not clear and convincing evidence that Mr. Hinckley knew the statement to be untrue. By that point in time, he had met with law

18

enforcement and requested that they obtain the Facebook and Verizon records. They pushed back, asserting that this request was beyond the normal scope of discovery, and arguably that it was beyond the parameters of *Brady* and *Giglio*. During the August 7, 2015, hearing, the trial court, Mr. Black's counsel and Mr. Hinckley all commented on the possibility that an issue of what constituted "due diligence" would result. When he made this statement Mr. Hinckley may have considered that he was required to exercise due diligence, and that attempting to get the records through law enforcement satisfied that requirement.

At the BPR hearing Bar Counsel, referring to this statement, asked, "And that was not a true statement, was it, Mr. Hinckley?" Mr. Hinckley answered, "That was not. I mean, it wasn't intended that way, but that was not." Mr. Hinckley's answer indicates his understanding, in hindsight, that he had not done exactly what the court had ordered him to do, but when making the statement he believed that he had. It is obvious that, in fact, Mr. Hinckley did not comply with the trial court's order which expressly required him to "promptly request that information from Facebook and Verizon Wireless." However, there is not clear and convincing evidence indicating Mr. Hinckley knew, when he made this statement, it was factually untrue.

2. "I made the request of the entities that deal with it . . . . So, if you order it, I'll give it another whirl." Read in context, it appears likely that Mr. Hinckley was reporting he requested the information from law enforcement. The statement was made in conjunction with his description of requesting that the sheriff's office obtain the information. At the BPR hearing Mr. Hinckley expressed uncertainty about the intent of this statement, and Bar Counsel asked, "You weren't trying to give Judge Day the impression that you'd reached out to Facebook and Verizon?" Hinkley responded, "[N]o," but then concluded, "I don't have an answer for you." When viewed in context, there is not clear and convincing evidence that this was an untrue statement.

The second portion of this statement includes a representation that Mr. Hinckley would make an additional effort if ordered. Although it is clear that Mr. Hinckley could have taken additional steps that would have complied with the order, the evidence does not establish that this statement to the court was untrue when made.

3. "But, again, if you order me Judge, I'll do the best I can." In context, Mr. Hinckley represented that he would ask law enforcement for the Facebook and Verizon records again. The record does not indicate that Mr. Hinckley knew or intended for this representation to be untrue.

4. "I'll make another formal verbal request, that is what the judge ordered from the order." The analysis for this statement is the same as for No. 3 above. The statement indicates that Mr. Hinckley claims to previously have made a formal verbal request, but in context it is likely Mr. Hinckley was referring to the request made of law enforcement.

5. "So, when there are – when there were discovery issues, obviously the State's done everything it can to try to remedy that." The context of this statement is necessary to determine whether it was an intentional misrepresentation of fact to the court. The statement was limited to a discussion of Verizon text messages. When read in context, this statement was not a claim that the State had done everything it could to obtain the Facebook and Verizon records, but rather that the State effectively could not obtain the requested text messages. Mr. Hinckley made this statement under the belief that both entities did not preserve those items for more than 90 days. He then explained that the State sent the phone to a forensics lab in an effort to find what he thought could not be obtained directly from Verizon.

At the BPR hearing, Bar Counsel questioned Mr. Hinckley about this statement without providing the context, reading only the statement in isolation. Mr. Hinckley responded, "[O]bviously, I didn't try everything." Bar Counsel then asked, "Well, that was just an untrue statement, wasn't it?" Mr. Hinckley responded, "No. I think, obviously, I just misspoke." There is not clear and convincing evidence that Mr. Hinckley made this statement knowing it to be false, as in context it only emphasized that the State had taken an extra measure to try to get text messages from the phone.

6. "Particularly considering counsel still wants phone and Facebook stuff, which we will leave and I will contact one of the deputies as soon as I leave here." Mr. Black's counsel characterized this as a "false promise." The record does not contain any evidence showing whether Mr. Hinckley did what he said he would, nor does it indicate that Mr. Hinckley knew this statement to be false when he made it.

7. " [Hinckley] mentioned that he contacted some representative of Facebook." This statement was made by Sheriff Whalen, not by Mr. Hinckley. The Amended Formal Charge against Mr. Hinckley alleged that he violated Rule 3.3(a) "by misrepresenting the extent of his efforts to obtain the Verizon and Facebook records," quoting only Rule 3.3(a)(1). The charge did not allege Mr. Hinckley failed to correct a witness's false material evidence, in violation of Rule 3.3(a)(3) ("If . . . a witness called by a lawyer[] has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal."). Rule 3.3(a)(1) only applies to statements made by a lawyer and does not apply to a statement made by a witness. For purposes of this analysis, Sheriff Whalen's statement is irrelevant because the Bar did not accuse Mr. Hinckley of violating Rule 3.3(a)(3).

8. The last two statements listed in the Bar's Amended Formal Charge as misrepresentations are statements made by Mr. Hinckley during the jury instruction conference at Mr. Black's trial. Mr. Black's attorney proposed an instruction on spoliation of evidence. The trial court asked Mr. Black's attorney what she was relying on to support

20

giving the instruction, and received this response: "I think at this point in time, Your Honor, the – that no one attempted to get the Facebook pages from Ms. Windsor-Denin that she testified existed. She didn't testify she deleted everything. And the nonexistence of – or existence of, I still don't know, of text messages between Trae Christopher and my client Mr. Black." The trial court then asked Mr. Hinckley for the State's position on the spoilation instruction. Mr. Hinckley said:

> I think we've had three or four hearings, you've heard my arguments back and forth in regards to asked (sic), it was denied. I tried to do it, I obviously didn't want to do it because I didn't want to become a witness. Had office people try to do it. **Had the F.B.I. help me.** I mean we don't – **we tried every way to get these deleted phantom messages**. And, again, I mean I was as close to becoming a witness in the case as possible because I had to have Sabrina and David in our office log onto the Verizon account and log onto Facebook and get the Facebook legal stuff to figure out whether or not this was possible. And I couldn't have contacted them myself. And, again, Dani was on maternity leave. [The Court: Okay.] I did the best I could to try to get the defense everything they wanted.

[¶46]  At the BPR hearing, Bar Counsel read the statements "I tried to do it. Had office people try to do it. Had the FBI help me." to Mr. Hinckley, and then asked, "[A]nd that wasn't true, was it?" Mr. Hinckley responded, "Yes, it was. I had our office people trying to do it. And I guess I'm confused. This is the difficulty of this, I think. The FBI – did Bonich go and actually – did I say, "Go get a preservation letter?" No I did not do that." Bar Counsel pressed the issue, asserting that Mr. Hinckley never actually asked the FBI agent "to help." Mr. Hinckley responded, "No. When I was talking with him, having coffee outside, I did ask him to help. That's why I brought him into the hearing. But I never asked him to send a preservation letter, if that's what you're asking. Maybe we're talking over each other."

[¶47]  The evidence shows Mr. Hinckley and Bar Counsel interpreted the term "help" differently. Mr. Hinckley considered his requests of Agent Bonich about the Facebook process to be requests for help. Bar Counsel considered the statements about asking the FBI for help to equate with asking the FBI to assist in the actual process of issuing a preservation request and/or warrant for the records. In light of the entire context of the dispute over who should, and how to, obtain Facebook and Verizon records, we do not find it highly probable that Mr. Hinckley knowingly misled the trial court in making this statement. Before this, Mr. Hinckley had called Agent Bonich as a witness and asked him to testify about the interaction they had. The trial court was fully aware of the nature of

21

that "help." There is not clear and convincing evidence that Mr. Hinckley violated Rule 3.3(a)(1) by this statement.

[¶48] In that same statement, Mr. Hinckley said, "[W]e tried every way to get these deleted phantom messages." When read in context, this statement was his conclusion from the efforts he had just listed to the court: (1) asked the Sheriff's Office for assistance and was denied, (2) tried personally to obtain the information but did not want to risk becoming a witness, (3) had office people help, and (4) contacted the FBI for information. Once again, when Mr. Hinckley made this statement, the trial judge was aware that no warrant had been issued, and the evidence does not support that Mr. Hinckley was attempting to state he had obtained a warrant. There is not clear and convincing evidence that Mr. Hinckley knew this statement to be untrue when he made it.

[¶49] Five and a half years later, at the BPR hearing, when Bar Counsel confronted Mr. Hinckley with this last statement, Mr. Hinckley replied, "Obviously, we didn't try every way, Counsel, but I did say that."[4] Bar Counsel then said, "You tried every way but the one thing that the judge had expressly ordered you to do. Correct?" Mr. Hinckley then said, "Issue the search warrants. Contact Verizon [W]ireless by issuing the search warrants." However, no trial court order requiring him to get a warrant for the information was entered before Mr. Hinckley made this last statement at the jury instruction conference about trying every way to get the messages. Although the original order required the State to obtain the records from Facebook and Verizon, it also focused on "due diligence" and the trial court had invited counsel to consult with the court if difficulties arose. Mr. Hinckley's statement at the BPR hearing indicates that he acknowledged he should have sought a warrant, but it does not amount to an admission that he knowingly made a false statement in September 2015.

[¶50] In total, the essence of the Bar's Rule 3.3(a)(1) charge asserts that Mr. Hinckley was reporting facts when he made each of these statements and was intentionally lying. In the context of the court order's "due diligence" requirement and the discussions of what the State believed it could and could not accomplish, there is not clear and convincing evidence that Mr. Hinckley knew or intended any of these statements to be untrue.

[¶51] Although we conclude that there was not clear and convincing evidence Mr. Hinckley knowingly made false statements of fact to the court as alleged in the Bar's Amended Formal Charge, we do not condone Mr. Hinckley's statements or actions. Over a period of years, Mr. Hinckley failed to comply with a court order to obtain the Facebook and Verizon materials and attempted to excuse his failure by emphasizing or exaggerating

---

[4] Some of the statements alleged to be false, when considered in context, are more qualitative than quantitative, and potentially hyperbole. Identification of such statements as a "false statement of fact" is difficult. They may be opinions rather than fact. Our analysis, however, focuses primarily on whether clear and convincing evidence established that when the statements are considered in context, they were intentionally false, as required by Rule 3.3(a).

what he perceived to be obstacles. Such avoidance of the issue (or perhaps hyperbole) had no proper place in Mr. Black's case or any case. Glib words and statements--words that aren't accountable and are not matched by performance--have no place among attorneys or in court.

[¶52] The dissent argues that it is improper to analyze the specific statements alleged to be rule violations to determine if they, in fact, violated Rule 3.3(a). Instead, it claims we should look at the entire set of circumstances, and even if none of the specific statements violated the rule, the totality of the situation could still constitute a violation of Rule 3.3(a). The dissent's approach bends and reshapes Rule 3.3(a) by eliminating the requirement that there be an intentional false statement of fact. It ignores the requirement that alleged violations of the Rules be set forth clearly and with particularity under W.R.D.P.13(a). The dissent concludes that Mr. Hinckley violated Rule 3.3(a) by giving the impression to the trial court that he made a good faith effort to obtain the records. This conclusion goes to Mr. Hinckley's failure to comply with the court order but was not alleged as a false statement of fact in the charges. Furthermore, it is contrary to Bar Counsel's closing argument which referred to the "nine instances in which [Mr. Hinckley] had misrepresented things to the court" or failed to correct Sheriff Whalen's testimony.

**Rule 3.4(c)**

[¶53] The Amended Formal Charge alleged Mr. Hinckley violated Rule 3.4(c) by failing to comply with the August 12, 2015, order and by making improper closing arguments at trial. Rule 3.4(c) states: "A lawyer shall not . . . knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on the assertion that no valid obligation exists."

[¶54] In closing argument at the disciplinary hearing, Mr. Hinckley's counsel admitted that Mr. Hinckley violated Rule 3.4(c) by failing to comply with the August 12, 2015, order. The BPR found clear and convincing evidence Mr. Hinckley violated Rule 3.4(c) by "knowingly misrepresenting the extent of his efforts to obtain the ordered digital records and by knowingly disobeying [the district court's] order to obtain and provide the records from Facebook and Verizon with all due diligence." The charges in this case did not accuse Mr. Hinckley of violating Rule 3.4(c) by "knowingly misrepresenting the extent of his efforts to obtain the ordered digital records," and such action could not constitute a violation of this rule (although it could constitute other rule violations).

[¶55] Consistent with the discussion of Rule 3.3 above, the term "knowingly" in Rule 3.4(c), as defined in Rule 1, denotes actual knowledge. As a result, a violation of this rule occurs only when an attorney actually knows of an obligation from a court order and intentionally fails to comply. A showing that an attorney should have known his or her conduct violated a court order is insufficient to prove a violation of Rule 3.4(c). *In re Alexander*, 232 Ariz. 1, 10, 300 P.3d 536, 545 (2013). Even a presumption of knowledge

is insufficient. To establish a violation of Rule 3.4(c), the Bar is required to prove, by clear and convincing evidence, that an attorney knew of the order and knew that his or her conduct violated it. *In re Doughty*, 832 A.2d 724, 732 (Del. 2003).

[¶56] At a hearing not long after he issued the August 12, 2015, order, the trial judge specifically reminded Mr. Hinckley that the written order required the state to "promptly request the information from Facebook and Verizon Wireless," and noted that Mr. Hinckley admitted the State had not, at that point, asked for anything from Verizon. He directly asked Mr. Hinckley if the State intended to make formal inquiry to Facebook and Verizon. Mr. Hinckley avoided making a direct answer, but the question itself shows Mr. Hinckley knew such a request was court ordered.

[¶57] After remand, on March 2, 2018, Mr. Hinckley told the trial court he had prepared search warrants for Facebook and Verizon, effectively acknowledging that he knew the court order required the State to obtain the records directly from those companies. Clear and convincing evidence establishes that Mr. Hinckley knowingly violated Rule 3.4(c) by failing to "promptly request the information from Facebook and Verizon Wireless," in accordance with the court's order.

[¶58] In addition to the assertion that Mr. Hinckley violated Rule 3.4(c) by disobeying the trial court's August 12, 2015, order, the Amended Formal Charge accused him of violating this rule by making improper arguments during trial. The Amended Formal Charge did not specify those improper arguments but generally described them from this Court's decision in Mr. Black's appeal, and noted that on appeal the State had conceded the arguments constituted misconduct by violating rules against vouching for witnesses, appealing to the passion or prejudice of the jury, and making personal attacks on opposing counsel.

[¶59] Our decision in Mr. Black's appeal found Mr. Hinckley's arguments in each of these areas violated unequivocal rules of law. *Black*, ¶¶ 31-35, 405 P.3d at 1055-56. At the BPR hearing, Mr. Hinckley's counsel admitted these statements violated the Rules of Professional Conduct but did not point to a specific rule. He said, "[T]hose comments are misconduct. . . . (W)e are here acknowledging that there has to be some punishment." Based only on this admission, and on our appellate decision, we accept that Mr. Hinckley violated Rule 3.4(c) with his closing statements which vouched for law enforcement, appealed to the jury's passion or prejudice and constituted personal attacks on opposing counsel, while acknowledging that there was no separate evidence that the violations were made knowingly.[5]

---

[5] In general, we do not agree that improper, overzealous argument should be charged as a violation of Rule 3.4(c). It would seem to be better suited to charges under other rules of professional conduct. *See, e.g.*, Rule 3.4(e) (a lawyer shall not "in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue

24

**Rule 3.8**

[¶60] Rule 3.8 provides special rules of conduct for prosecutors. The complaint charged Mr. Hinckley with violating Rule 3.8 by failing to take immediate action to preserve the Verizon and Facebook records. Specifically, Bar Counsel alleged that, as soon as the case was assigned to him, Mr. Hinckley should have been aware the victim's cell phone records and Facebook account contained information that may be important to the investigation. The charge stated companies like Verizon and Facebook would honor law enforcement's timely requests to preserve evidence. Although Bar Counsel did not identify which specific subsection of Rule 3.8 Mr. Hinckley allegedly violated by failing to preserve the digital records, the BPR only made findings under Rule 3.8(d). That rule states a prosecutor in a criminal case shall:

> (d) make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal[.]

Rule 3.8(d).

[¶61] The BPR concluded Mr. Hinckley had committed "numerous violations" of Rule 3.8(d) by "failing to take action to preserve digital evidence for disclosure to the defense either at the outset of the case or following the [district court's] August 12, 2015 order." As we discussed elsewhere in this decision, Mr. Hinckley's failure to comply with the court's order directing him to contact Facebook and Verizon violated other rules of professional conduct. His failure to take action to preserve and obtain the records in accordance with the court's order also meant he was unable to fulfill his obligation to make timely disclosure of them under Rule 3.8(d). This constitutes a violation of Mr. Hinckley's duties to the public under Rule 3.8(d).

[¶62] However, the BPR did not explain why Mr. Hinckley had an obligation, either under substantive law or the ethical rules, to preserve the Verizon and Facebook evidence at the **outset** of the case. The parties presented expert opinions about whether Mr. Hinckley or law enforcement had such an obligation under the facts of this case. However, the answer to this question is a complex factual and legal issue which was never answered in *Black* or

except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused") or Rule 8.4(d) (conduct prejudicial to the administration of justice).

addressed by the BPR. In *Willoughby v. State,* 2011 WY 92, ¶ 39, 253 P.3d 157, 170-71 (Wyo. 2011), we discussed the intersecting due process obligations of the prosecution to preserve and produce evidence in accordance with the United States Supreme Court decisions in *Brady,* 373 U.S. 83, 83 S.Ct. 1194, *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), and *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). The question in this case is even more complicated because it involved Mr. Black's allegation the State had an obligation to seek out evidence that was not in its control. *See, e.g., United States v. Graham,* 484 F.3d 413, 417 (6th Cir. 2007) ("'*Brady* clearly does not impose an affirmative duty upon the government to take action to discover information which it does not possess.'" (quoting *United States v. Beaver,* 524 F.2d 963, 966 (5th Cir. 1975)).

[¶63] In *People v. Coy,* 669 N.W.2d 831, 844 (Mich. Ct. App. 2003), the Michigan Court of Appeals stated that due process does not generally "require that the prosecution seek and find exculpatory evidence. Although the prosecution bears the burden of proving guilt beyond a reasonable doubt in a criminal trial, it need not negate every theory consistent with defendant's innocence[.] . . . [N]either the prosecution nor the defense has an affirmative duty to search for evidence to aid in the other's case." *Id.* (citations omitted). *See also, Gordon v. State,* 117 P.3d 214, 218 (Nev. 2005) (although the rule is not absolute, police generally do not have a duty to collect all potential evidence at a crime scene).

[¶64] In addition, the facts do not support a finding that Mr. Hinckley should have, or even could have, prevented anything from being deleted from Ms. Windsor's phone prior to the extraction. The phone was taken by law enforcement for extraction **the same day** Mr. Hinckley was assigned the case (October 28, 2014). Mr. Black claimed the fact that the extraction report showed items as having been deleted from the phone demonstrated evidence had not been properly preserved. Before that day, Mr. Hinckley could not have known that the victim used photos from the phone to help her remember certain events. Even if we could assign blame to the State for failing to take earlier action to preserve the evidence on Ms. Windsor's phone, that does not mean Mr. Hinckley violated an ethical duty by failing to contact Verizon or Facebook to preserve information that Ms. Windsor deleted **before** he assumed responsibility for the prosecution.

[¶65] Furthermore, under Rule 3.8(d), the prosecutor only has the responsibility to disclose evidence or information "known" to him. The ABA issued a formal opinion in 2009, addressing the prosecutor's responsibilities under Rule 3.8(d). ABA Comm. on Ethics & Pro. Resp., Formal Op. 494 (2009). With regard to the knowledge requirement, the Committee stated:

> Rule 3.8(d) requires disclosure only of evidence and information "known to the prosecutor." Knowledge means actual knowledge, which may be inferred from the circumstances. Although a lawyer cannot ignore the obvious,

26

> Rule 3.8(d) does not establish a duty to undertake an investigation in search of exculpatory evidence. . . . Although the rule requires prosecutors to disclose *known* evidence and information that is favorable to the accused, it does not require prosecutors to conduct searches or investigations for favorable evidence that may possibly exist but of which they are unaware. . . . Rule 3.8 does not require the prosecutor to review or request [voluminous files or all police files] unless the prosecutor actually knows or infers from the circumstances, or it is obvious, that the files contain favorable evidence or information. . . . Rule 3.8(d) ordinarily would not require the prosecutor to conduct further inquiry or investigation to discover other evidence or information favorable to the defense unless he was closing his eyes to the existence of such information or evidence.

*Id.* (citations, quotation marks, and brackets omitted).

[¶66]  The BPR did not make any finding that Bar Counsel had proven by clear and convincing evidence exculpatory evidence existed that was "known" to Mr. Hinckley. There is some discussion in the BPR's Report and Recommendation that he should have been aware there was information on the victim's phone and Facebook page because a deputy's report showed the victim used those resources to "reconstruct" her memory of the incident.  However, the BPR did not specifically find Mr. Hinckley knew evidence or information existed that was favorable to the defense, obligating him to investigate further in accordance with the principles set out in the ABA opinion.

[¶67]  There is not clear and convincing evidence that Mr. Hinckley violated Rule 3.8(d) by failing to attempt to preserve Facebook and Verizon records from the outset of the case because the evidence does not establish that Mr. Hinckley knew of exculpatory evidence at that point in time.

**Rule 5.3**

[¶68]  The Amended Formal Charge alleged that "Hinckley's failure to confirm that law enforcement sent timely preservation letters to Verizon and Facebook violated Rule 5.3." Rule 5.3 provides:

> With respect to a nonlawyer employed or retained by or associated with a lawyer: …
>
> (b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the

27

person's conduct is compatible with the professional obligations of the lawyer; and

(c) a lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if:

(1) The lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or

(2) The lawyer is a partner or has comparable managerial authority in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

[¶69]   A complete analysis of whether Rule 5.3 applies in general to prosecuting attorneys who work with law enforcement staff from independent agencies, and whether this rule applies in the circumstances of this case would be substantial.  It is, however, unnecessary to conduct that analysis.  The gist of this complaint is that Mr. Hinckley should have directed investigators to preserve and obtain the Facebook and Verizon records from the very outset of the case.  This claim is simply a corollary of the claim that Mr. Hinckley himself violated Rule 3.8(d), discussed above.  As noted there, the Bar did not establish, by clear and convincing evidence, that Mr. Hinckley had a legal obligation to preserve the Verizon and Facebook evidence at the outset of the case.  Each side presented an expert witness who offered some opinions on this issue, but there was no legal analysis sufficient to establish such an obligation under the facts of this case.  The BPR offers no such legal analysis in its Report.  Consequently, the Bar did not prove the alleged violation of Rule 5.3 by clear and convincing evidence.

**Rule 8.4**

[¶70]   The Formal Charge alleged Mr. Hinckley's conduct "as set forth above" violated Rule 8.4(d).  Although this allegation did not state with particularity how Mr. Hinckley violated the rule, he admitted the violation.[6]

[¶71]   Rule 8.4(d) provides:  "It is professional misconduct for a lawyer to . . . (d) engage in conduct that is prejudicial to the administration of justice."  Although we have addressed violations of Rule 8.4(d) in prior cases, we have never precisely defined what type of conduct violates the rule.  Our cases demonstrate Rule 8.4(d) does not prohibit an attorney

---

[6] Mr. Hinckley also did not "request that the allegation be set forth with greater particularity" or challenge it "for failure to charge misconduct constituting grounds for discipline" under W.R.D.P. 14(a).

from making a mistake, or even from committing malpractice. It focuses on conduct which interferes with the legal process. *See, e.g.*, *Bd. of Pro. Responsibility v. Fulton,* 2006 WY 51, 133 P.3d 514, 518 (Wyo. 2006) (the attorney violated Rule 8.4(d) "by counseling [the clients] regarding how to unlawfully avoid tax consequences of interest earned from the settlement monies"); *Bd. of Pro. Responsibility v. Barnes,* 2013 WY 5, 297 P.3d 77, 78-79 (Wyo. 2013) (attorney was disbarred after falsifying documents he presented to the county treasurer in violation of several rules of professional conduct, including Rule 8.4(d)); *Bd. of Pro. Responsibility v. Davidson,* 2009 WY 48, ¶¶ 5, 19, 205 P.3d 1008, 1010, 1016 (Wyo. 2009) (attorney violated Rule 8.4(d) by falsely alleging in a motion for reassignment of the trial judge that the judge had engaged in an improper *ex parte* communication with opposing counsel and was "rumored" to afford favoritism to members of opposing counsel's firm).

[¶72] In light of this precedent, we adopt a test from the D.C. Court of Appeals for determining whether an attorney's conduct violates Rule 8.4(d). *In re Owusu,* 886 A.2d 536 (D.C. 2005). Under that test, the disciplinary authority must present clear and convincing evidence: "(1) that the attorney acted improperly in that he either [took] improper action or fail[ed] to take action when ... he or she should [have] act[ed]; (2) that the conduct involved bear[s] directly upon the judicial process (*i.e.,* the administration of justice) with respect to an identifiable case or tribunal; and (3) that the conduct taint[ed] the judicial process in more than a *de minimis* way, meaning that it at least potentially impact[ed] upon the process to a serious and adverse degree." *Id.* at 541 (citations and quotation marks omitted). *See also, Att'y Grievance Comm'n v. Moawad,* 257 A.3d 611, 644 (Md. 2021) ("An attorney violates [Rule 8.4(d)] when his or her conduct impacts negatively the public's perception or efficacy of the courts or legal profession.") (citation and quotation marks omitted).

[¶73] Under the *Owusu* test, the Bar presented clear and convincing evidence Mr. Hinckley engaged in conduct prejudicial to the due administration of justice by failing to comply with the district court's order to promptly request records from Facebook and Verizon. As we stated in our discussion of Rule 3.4(c), he failed to take action to comply with the order when he should have, that conduct bore directly on the judicial process, and it impacted the process in a serious and adverse degree given Mr. Black's conviction was reversed and the court was required to engage in an unnecessary ongoing discovery dispute. *See Bd. of Pro. Responsibility v. Pretty*, 2020 WY 55, 462 P.3d 446, 448 (Wyo. 2020) (lawyer's failure to follow court order violated Rule 8.4(d)).

**Rule 3.6(a) and Rule 3.8(e)**

[¶74] The BPR found the alleged violations of these rules were not proven by clear and convincing evidence and dismissed them pursuant to W.R.D.P. 15(b)(3)(B).

## DISCUSSION OF SANCTIONS

[¶75] Having found Mr. Hinckley violated Rules 1.3, 3.2, 3.4(c), 3.8(d), and 8.4(d), we move to the issue of what sanction is appropriate for his conduct. Under W.R.D.P. 15, proceedings before the BPR are bifurcated. Rule 15(b)(3) states: "At the hearing, the Hearing Panel shall first receive evidence regarding whether a violation of the Wyoming Rules of Professional Conduct occurred. When all evidence on that issue has been received, the Hearing Panel shall recess to determine whether a violation has been proved by clear and convincing evidence." Only when the BPR determines there has been a violation shall it "receive evidence of aggravating or mitigating circumstances before determining the appropriate discipline for the violation." W.R.D.P. 15(b)(3)(C). Like in the first phase of the disciplinary proceeding, factual matters in the sanctions phase must be proven by clear and convincing evidence. *Custis,* ¶ 42, 348 P.3d at 833.

[¶76] When the BPR recommends public censure, suspension, or disbarment, the Court reviews the BPR's report and recommendation. W.R.D.P. 16(c)(2). The Court gives "due consideration to the findings and recommendations of the [BPR]," although the ultimate disciplinary ruling is made by the Court. W.R.D.P. 16(b). In other words, our decision is made de novo, after reviewing the report. For us to adequately review the report and recommendation, the BPR should separately set out its factual findings relevant to each part of the bifurcated proceeding. Otherwise, we have no way of understanding each part of the BPR's recommendation. The Report and Recommendation in this case does not connect facts to findings in either part of the BPR's recommendation.

[¶77] W.R.D.C. 15(b)(3)(D) provides the general standard for determining the appropriate sanction for lawyer misconduct:

> (D) In imposing a sanction after a finding of misconduct by the respondent, the Hearing Panel shall consider the following factors, as enumerated in the ABA Standards for Imposing Lawyer Sanctions [(ABA Standards)], which standards shall be applied by the Hearing Panel in determining the appropriate sanction:
>> (i) Whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession;
>> (ii) Whether the lawyer acted intentionally, knowingly, or negligently;
>> (iii) The amount of the actual or potential injury caused by the lawyer's misconduct; and
>> (iv) The existence of any aggravating or mitigating factors.

*See also,* ABA Standards § 3.0 ("In imposing a sanction after a finding of lawyer misconduct, a court should consider the following factors: (a) the duty violated; (b) the

30

lawyer's mental state; (c) the potential or actual injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors.").

[¶78]  For purposes of determining the proper sanctions, "intent" is defined in the ABA Standards as "the conscious objective or purpose to accomplish a particular result." "Knowledge" is defined as "the conscious awareness of the nature or attendant circumstances of his or her conduct but without the conscious objective or purpose to accomplish a particular result." "Negligence" is defined as the "failure of the lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." "Injury" is defined as "harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct. The level of injury can range from 'serious' injury or 'little to no' injury[.]" "Potential injury" is "the harm to a client, the public, the legal system or the profession that is reasonably foreseeable at the time of the lawyer's misconduct, and which, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct." ABA Standards, Definitions.

[¶79]  ABA Standards 4.0 through 8.4 are grouped in terms of whether the duty violated by the lawyer was owed to the client, the public, the legal system, or the profession. They set out specific considerations for each type of violation. We will address Mr. Hinckley's specific instances of misconduct using this format.

**Violation of Duty Owed to the Client (Rule 1.3)**

[¶80]  We determined that Mr. Hinckley violated his duty to act diligently under Rule 1.3 by failing to comply with the Court's deadline for filing witness and exhibit lists and jury instructions, by failing to adequately investigate the availability of Facebook and Verizon records before making representations to the court, and by being chronically late in responding to motions. The Bar did not charge Mr. Hinckley with violation of this rule by failing to comply with the discovery order, so that conduct is not considered in determining sanctions under Rule 1.3. Mr. Hinckley's lack of diligence under Rule 1.3 violated a duty owed to his client – the State of Wyoming and its political subdivision, Teton County. ABA Standard 4.4 addresses the levels of sanction when an attorney violates Rule 1.3. *See Bd. of Pro. Responsibility v. Crawford-Fink,* 2018 WY 130, 430 P.3d 323, 333 (Wyo. 2018).

> 4.4 Lack of Diligence
>
> Absent aggravating or mitigating circumstances . . . the following sanctions are generally appropriate in cases involving a failure to act with reasonable diligence and promptness in representing a client:

31

4.41 Disbarment is generally appropriate when:

. . .

   (b) a lawyer knowingly fails to perform services for a client and causes serious or potentially serious injury to a client; or

   (c) a lawyer engages in a pattern of neglect with respect to client matters and causes serious or potentially serious injury to a client.

4.42 Suspension is generally appropriate when:

   (a) a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client, or

   (b) a lawyer engages in a pattern of neglect and causes injury or potential injury to a client.

4.43 Reprimand is generally appropriate when a lawyer is negligent and does not act with reasonable diligence in representing a client, and causes injury or potential injury to a client.[7]

4.44 Admonition is generally appropriate when a lawyer is negligent and does not act with reasonable diligence in representing a client, and causes little or no actual or potential injury to a client.[8]

(footnotes added).

[¶81] Mr. Hinckley's lack of diligence in complying with court-imposed deadlines is apparent in the record. It is also apparent that he knew of the deadlines, but repeatedly failed to comply. The district court admonished and warned Mr. Hinckley time and again that he was required to obey the court's rules and its orders, to no avail. It can be inferred from the record that he acted knowingly, with awareness of the nature and circumstances of his actions. Also, Mr. Hinckley acknowledged his conduct showed a pattern of negligence. Furthermore, Mr. Hinckley's failure to conduct additional investigation into the availability of Facebook and Verizon records before making representations to the court flies in the face of the ongoing controversy in Mr. Black's case. Particularly after remand, it can be inferred that he acted knowingly when he failed to investigate or contact Facebook or Verizon at all.

---

[7] In Wyoming, a reprimand is referred to as a public censure. W.R.D.P. 9(a)(3). *See also,* ABA Standard 2.5 (a reprimand is also known as a public censure).

[8] In Wyoming, an admonition is referred to as a private reprimand. W.R.D.P. 9(a)(4). *See also,* ABA Standard 2.6 (an admonition is also known as a private reprimand).

[¶82]  The record establishes Mr. Hinckley caused potential injury to his client.  By failing to respond to scheduling deadlines and defense motions in a timely fashion, Mr. Hinckley risked continuances and sanctions against the State.  By failing to conduct additional investigation before making representations to the court, he risked sanctions and a potential reversal of a future conviction.  Under ABA Standard 4.4, the presumptive sanction against Mr. Hinckley for violating Rule 1.3 is suspension.

[¶83]  We disagree with the BPR's conclusion that disbarment was the appropriate sanction because Mr. Hinckley "caused serious or potentially serious injury to the client."  No sanctions were ever imposed against the State for any of Mr. Hinckley's failures to comply with the filing deadlines.  No evidence indicated that items deleted from Facebook or Verizon before October 28, 2014, could have ever been recovered.  The appropriate sanction for Mr. Hinckley's violation of Rule 1.3 is suspension because, although he acted knowingly, there was no serious or potentially serious injury to his client.

**Violations of Duties Owed to the Legal System (Rules 3.2, 3.4(c), and 8.4(d))**

[¶84]  Mr. Hinckley's violations of Rules 3.2, 3.4(c), and 8.4(d) were based on his failure to comply with the district court's August 12, 2015, order requiring him to promptly request Ms. Windsor's records from Facebook and Verizon.  Mr. Hinckley's violations of Rules 3.2, 3.4(c), and 8.4(d) fall under the heading of abuse of legal process for the purposes of determining the appropriate sanction.[9]  The presumptive sanctions for such violations are found in ABA Standard 6.2, which states in relevant part:

> 6.2 Abuse of Legal Process
>
> Absent aggravating or mitigating circumstances . . . the following sanctions are generally appropriate in cases involving the failure to expedite litigation or bring a meritorious claim, or failure to obey any obligation under the rules of the tribunal except for an open refusal based on an assertion that no valid obligation exists:
>
> 6.21 Disbarment is generally appropriate when a lawyer knowingly violates a court order or rule with the intent to obtain a benefit for the lawyer or another, and causes serious

---

[9] We note that a violation of Rule 8.4(d) may fall under a different sanctions section depending upon the lawyer's specific conduct.  For example, ABA Standard 6.1 would apply if the lawyer's interference with the administration of justice involved providing false information to a court.  *See Custis,* ¶ 49, 348 P.3d at 834 (lawyer violated 8.4(d) by submitting court brief containing material misrepresentations of a witness's testimony).  *See also,* ABA Standard 5.2 (public official engages in conduct prejudicial to the administration of justice).

injury or potentially serious injury to a party or causes serious or potentially serious interference with a legal proceeding.

6.22 Suspension is generally appropriate when a lawyer knows that he or she is violating a court order or rule, and causes injury or potential injury to a client or other party, or causes interference or potential interference with a legal proceeding.

6.23 Reprimand is generally appropriate when a lawyer negligently fails to comply with a court order or rule, and causes injury or potential injury to a client or other party, or causes interference or potential interference with a legal proceeding.

6.24 Admonition is generally appropriate when a lawyer engages in an isolated instance of negligence in complying with a court order or rule, and causes little or no actual or potential injury to a party, or causes little or no actual or potential interference with a legal proceeding.

[¶85]  As we stated in the violations section of this decision, the Bar produced clear and convincing evidence that Mr. Hinckley violated Rules 3.2, 3.4(c), and 8.4(d) by knowingly failing to comply with the August 12, 2015, order.  Also, Mr. Hinckley apparently[10] admitted he violated Rule 3.4(c) by improperly vouching for witnesses, appealing to the passion and prejudice of the jury, and making personal attacks on opposing counsel during closing argument at Mr. Black's trial.  *See Black,* ¶¶ 29-35, 405 P.3d at 1055-57 (Mr. Hinckley committed prosecutorial misconduct because his arguments violated clear and unequivocal rules of law).

[¶86]  The evidence established Mr. Hinckley injured his client and interfered with the legal proceeding because his actions resulted in the reversal of Mr. Black's conviction and required additional proceedings on remand.  The presumptive sanction under ABA Standard 6.2 is suspension.

[¶87]  The BPR does not point out, and we have not found, clear and convincing evidence that he specifically intended to obtain a benefit for himself or the State, which is necessary to support disbarment.  The BPR makes the conclusory findings that Mr. Hinckley acted with intent to benefit the prosecution and had a conscious objective to accomplish a particular result.  However, the BPR does not explain what evidence showed his intent

---

[10] As discussed in the violations section, Mr. Hinckley's counsel admitted the statements were misconduct, but did not address Rule 3.4(c) when making that admission.  This type of misconduct does not fit well under 3.4(c) and likely should have been charged differently.

34

(conscious objective) or what result he intended to accomplish by failing to follow the court order. The appropriate sanction for Mr. Hinckley's violations of Rules 3.2, 3.4(c), and 8.4(d) is suspension because, although he acted knowingly, there was no showing he acted with the requisite specific intent.

## Violation of Duties Owed to the Public (Rule 3.8(d))

[¶88] Mr. Hinckley's failure, as a prosecutor, to comply with the court's August 12, 2015, order in violation of Rule 3.8(d) implicated his duties as a public official. By failing to comply with the district court's order directing him to promptly request Ms. Windsor's records from Facebook and Verizon, Mr. Hinckley violated a duty owed to the public. ABA Standard 5.2 addresses a public official's failure to maintain the public trust. That standard provides:

> 5.2 Failure to Maintain the Public Trust
>
> Absent aggravating or mitigating circumstances, . . . the following sanctions are generally appropriate in cases involving public officials who engage in conduct that is prejudicial to the administration of justice or who state or imply an ability to influence improperly a government agency or official:
>
> 5.21 Disbarment is generally appropriate when a lawyer in an official or governmental position knowingly misuses the position with the intent to obtain a significant benefit or advantage for himself or another, or with the intent to cause serious or potentially serious injury to a party or to the integrity of the legal process.
>
> 5.22 Suspension is generally appropriate when a lawyer in an official or governmental position knowingly fails to follow proper procedures or rules, and causes injury or potential injury to a party or to the integrity of the legal process.
>
> 5.23 Reprimand is generally appropriate when a lawyer in an official or governmental position negligently fails to follow proper procedures or rules, and causes injury or potential injury to a party or to the integrity of the legal process.
>
> 5.24 Admonition is generally appropriate when a lawyer in an official or governmental position engages in an isolated instance of negligence in not following proper

35

procedures or rules, and causes little or no actual injury to a party or to the integrity of the legal process.

[¶89] Mr. Hinckley occupied a governmental position and, as we have stated previously, he knowingly failed to follow the August 12, 2015, order requiring him to exercise "due diligence" to obtain Ms. Windsor's Facebook and Verizon records and "promptly request" the information and provide it to defense counsel. He caused injury to the State and the integrity of the legal process because Mr. Black's conviction was reversed and the case had to be remanded for extensive additional proceedings. Suspension is, therefore, the presumptive sanction.

[¶90] The BPR found Mr. Hinckley "was a governmental attorney [and] he knowingly misused his position with the intent to obtain a significant benefit or advantage for himself and with the intent to damage or cause serious damage to the integrity of the legal process," supporting disbarment. The record does not contain clear and convincing evidence to support this finding. The evidence does not establish that Mr. Hinckley had such specific intentions; rather, it indicates that he was extremely negligent, passive to law enforcement, and narrowly focused on his verbal agreement to use due diligence rather than on the language of the court order. The appropriate sanction for Mr. Hinckley's violation of 3.8(d) is suspension because, although he acted knowingly when he violated the court order and injured the State and the legal process, there was no evidence he misused his position with the specific intent to obtain a significant benefit or advantage or to seriously damage the integrity of the legal process.

**Aggravating Factors**

[¶91] Under § 9.1 of the ABA standards for sanctions, the court is to consider any relevant aggravating or mitigating circumstances during the penalty phase.

[¶92] The record supports finding four aggravating circumstances. First, Mr. Hinckley's failure to issue search warrants to Facebook and Verizon after the remand showed a dishonest motive under ABA Standard 9.22(b). Although the Bar did not charge Mr. Hinckley with any rule violations for this conduct, the record demonstrates he implied to the trial court that the search warrants were about to be issued in March 2018. Over three months later, he admitted that he had not read them and that they were still not ready to be served. Second, Mr. Hinckley engaged in a pattern of misconduct under Standard 9.22(c) by repeatedly violating the court's order to contact Facebook and Verizon despite the trial court's admonishments and warnings. Third, Mr. Hinckley committed multiple separate offenses of the Rules of Professional Conduct throughout the prosecution of Mr. Black under Standard 9.22(d). He did not file documents in accordance with the district court's scheduling order; he repeatedly failed to comply with the district court's order requiring him to contact Facebook and Verizon to obtain Ms. Windsor's records for the defense; and he made improper statements during his closing argument at trial. *Cf. Custis,* ¶ 54, 348

P.3d at 835 (violations of more than one rule of professional conduct by a single action were not multiple offenses for purposes of finding an aggravating factor). Finally, Mr. Hinckley had substantial experience in the practice of law as he had worked as a prosecutor in two different Wyoming counties for over ten years. Standard 9.22(i).

[¶93] Without explaining what factual findings supported its conclusions, the BPR found two additional aggravating factors. It determined Mr. Hinckley was indifferent to making restitution under ABA Standard 9.22(j) and refused to acknowledge the wrongful nature of his conduct under ABA Standard 9.22(g). The record does not support the BPR's finding that Mr. Hinckley was indifferent toward making restitution, as no restitution from Mr. Hinckley was requested or ordered. The BPR made no effort to explain how it was appropriate to assign that aggravating factor when it did not make a restitution order. The record also does not support a conclusion that Mr. Hinckley refused to acknowledge the wrongful nature of his conduct. Mr. Hinckley admitted in his answer to the Amended Formal Charge that he had violated Rules 1.3, 3.2, and 8.4(d). He also admitted, at the disciplinary hearing, that he violated Rule 3.4(c) by making improper arguments at trial. During the first phase of the disciplinary hearing, Mr. Hinckley testified he had made mistakes in Mr. Black's case and was subject to discipline for them. His statements during the penalty phase show even greater contrition:

> I'm proud of my career. I'm not proud of this. It was sloppy, negligent and . . . cavalier. . . .
>
> No excuses. It's been a colossal professional failure on every level. I failed the people of the State of Wyoming. I failed the people of Teton County. I failed myself. But most importantly, I failed Kelli [the victim] and her family.
>
> So what happens to me today is minor, considering the damage I've done to those entities I just talked to you about.

[¶94] The BPR's conclusion that Mr. Hinckley was indifferent toward making restitution and refused to acknowledge the wrongfulness of his conduct appear to have been based upon Mr. Hinckley's rejection of a three-year suspension conditioned upon Teton County paying Mr. Black to settle his threatened civil rights claim. The factual findings in the BPR's Report and Recommendation which apparently support its conclusions are:

> 86. Prior to filing a formal charge against Mr. Hinckley, Bar Counsel proposed that Mr. Hinckley stipulate to a lengthy suspension of his Bar license in order to resolve the matter. Negotiations for a stipulated resolution reached an apparently successful conclusion in September 2019, with Mr. Hinckley agreeing to a three-year suspension conditioned upon

a final settlement of Black's wrongful-prosecution civil rights claim against Mr. Hinckley and the Teton County and Prosecuting Attorney's Office. Teton County Attorney Weisman advised the Teton County Commissioners to offer a $48,000 settlement to Black, advice based in part on the desire to bring the disciplinary action against Mr. Hinckley to a satisfactory conclusion, thereby bringing an end to the attorney's fees for Mr. Hinckley that were being paid by the county. With the approval of the board of county commissioners, Weisman offered $48,000 to Black to settle his civil rights claim. Black accepted the offer and signed a mutual release of claims, contingent upon Hinckley's acceptance (and approval by the BPR and the Court) of a three-year suspension of his Bar license.

87.     When the agreed-upon settlement documents were presented to Hinckley, he balked at being part of any resolution that would mean paying money to Black (though Hinckley had not been asked to contribute financially to the settlement).

88.     With settlement talks scuttled, Bar Counsel filed a formal disciplinary charge against Hinckley on November 13, 2019. At the same time, Black filed a pro se civil rights action against Hinckley, the Teton County and Prosecuting Attorney's Office and other county officials and entities.

89.     Weisman turned the matter of Black's civil rights action over to the Local Government Liability Pool (LGLP), a shared risk fund to which counties . . . pay premiums based on their respective claims history. Eventually, a settlement of Black's lawsuit was reached, with the LGLP paying $85,000 and Teton County contributing $50,000 toward a $135,000 settlement with Black.

90.     The disciplinary action against Hinckley proceeded to a hearing. At the time of the hearing, Teton County had paid more than $168,000 in attorney's fees and costs on Hinckley's behalf. Hinckley had paid nothing, either toward the settlement with Black or for his attorney's fees.

[¶95]  At the disciplinary hearing, Mr. Hinckley explained his reasons for refusing to stipulate to discipline against him:

Q. . . . Can you tell the panel why it is that you have not considered entering into any of the particular agreements that have been proposed?

A. . . . [I]t's pretty simple. I think prosecutors want to try to get it right. But every – at least in my perception – and this is a tough process to go through. But my perception, every offer that came from the state bar association had not only me having to accept my mistakes, but completely absolve Josh Black of anything he did. He was convicted by a jury. He pled nolo to another felony. And I was not going to do that. He got a Christmas gift from my screw-ups.

Q. And when you say absolve him, some of [the stipulated discipline offers] dealt with payment of money to him?

A. Correct. Correct.

Q. Had you ever agreed to do that?

A. No.

Q. And why not?

A. I didn't – I didn't beat up [Ms. Windsor]. I didn't cause this problem. And I don't owe him any money. Obviously, I'm subject to this board.

. . .

Q. . . . [H]as bar counsel ever offered you a settlement that didn't involve some kind of payment of attorney's fees to Black, some kind of other compensation?

A. Not that I recall.

Bar Counsel followed up with that line of questioning on redirect examination of Mr. Hinckley:

Q. . . . [N]ow to fast-forward to the settlement discussion we've had to avoid coming to this hearing today, you recall that we

39

[had a] very intense discussion in 2019 before the formal charge was filed. Correct?

A. I trust you, Counsel. I don't remember.

. . .

Q. And you were aware, were you not, that [your counsel] and I had agreed in substance to a three-year suspension of your license to practice law? You were aware of that, weren't you?

A. I'm sure I was made aware of it.

Q. Yeah. In fact, we did a lot of work on the affidavit and the stipulated motion. Do you recall that?

A. I know you guys worked on it a lot.

Q. And you said that I refused to negotiate anything that didn't absolve Josh Black. What were you talking about?

A. I guess maybe I was just inarticulate. I was not going to agree to something where it looked like I was the one who made all the mistakes, and I come in here and admit them, and then he goes out and says, "I didn't do it."

Q. But I never – to be fair, I never made a demand that absolved Josh Black, did I?

A. That's my word. I don't know if you made a demand to absolve.

Q. And there was something else going on off to the side at the same time that we were negotiating a stipulated resolution of this proceeding, and that was that Teton County had offered $50,000 to Josh Black to settle the pro se civil rights action that he filed. Correct?

A. I don't know the number. I didn't pay any attention to that.

Q. Is it your understanding that I had any involvement in that?

A. No, no, no, no, no, no, no, no. That wasn't my implication. No, no, no. That wasn't my implication.

Q. All right. Thank you for clearing that up. And do you have an understanding that the county commissioners approved ponying up a substantial sum of money to retain a release of the civil rights case?

A. Obviously, I think the county commissioners would have to approve that.

Q. That was based on someone's assessment of the risk that your conduct –

A. Yes.

Q. -- had injected into the case?

A. Yes.

Q. And is it your understanding that they had agreed to pay that, and Josh Black had agreed to accept that and sign a release?

A. If you tell me that's what happened, then I agree that's happened.

Q. Do you have an understanding that on my way to the bar convention in [2019] – that was September of [2019] – I stopped at the honor farm and obtained Josh Black's signature on an agreement to release his claim for $50,000?[11]

. . .

A. I believe you stopped by the honor farm to obtain his signature.

Q. And that I had that in my bag. You understand that all had been done. Correct?

_____

[11] There is no explanation in the record as to why Bar Counsel was involved in obtaining Mr. Black's signature on a settlement of a potential civil action against the County or why Mr. Hinckley was required to agree that a financial settlement would be paid to Mr. Black by others to resolve the Bar's charges against him.

41

A. I trust your recitation.

Q. And you understood that the whole thing was contingent on the BPR approving a three-year suspension, the Supreme Court issuing that order, and then the money and the dismissal of the civil suit would change hands. Have I stated correctly what your understanding of the deal was back then?

A. Counsel, you said – you kind of said it like they were meshing. I was never under the impression, as far as I can tell – the resolution of the civil rights case. I thought that was all on its own. I mean, I didn't realize – I'm not – so, if you say that is part of what you were going to offer me, that it was kind of all those working parts, I believe you. But I seriously wanted nothing to do with the civil rights stuff. And I don't know, when I left the office, when that all got finalized anyway.

Q. But in any event, you didn't sign the paperwork that [your counsel] and I had negotiated for you to sign for the three-year suspension?

A. No, because we're here.

. . .

Q. And it's true, isn't it, that Teton County, in addition to what they kicked into whatever settlement [with Black], has been paying your legal fees in this disciplinary proceeding?

A. That is correct.

Q. Do you know how much they paid?

A. I have [sic] not.

Q. In any event, you don't – you don't have any financial stake in how this proceeding – how long it lasts or what it costs. Am I correct about that?

42

A. You're intimating that the Teton County commission will just keep paying if this were to last another month? I'm asking rhetorically.

Q. Well, I don't have an indication that they won't. Do you?

A. I do not.

(footnote added).

[¶96] The Wyoming Rules of Evidence generally apply to disciplinary hearings. W.R.D.P. 15(b). W.R.E. 408 prohibits admission of evidence of settlement negotiations to prove liability. *Smyth v. Kaufman,* 2003 WY 52, ¶¶ 25-26, 67 P.3d 1161, 1168-69 (Wyo. 2003); *Haderlie v. Sondegroth,* 866 P.2d 703, 713 (Wyo. 1993). *Cf. In re Disciplinary Action Against Landon*, 600 N.W.2d 856, 859 (N.D. 1999) (rule of evidence 408 does not prohibit consideration of settlement evidence for its value as a possible mitigating factor to formulate appropriate sanctions against the attorney, so long as it is not admitted to establish a rule violation). The settlement evidence was admitted during the first part of the disciplinary action which was focused on determining whether Mr. Hinckley had violated the rules of professional conduct. There was no discussion of limiting the scope of the settlement evidence to the penalty phase.[12] Under W.R.E. 408, that was improper.

[¶97] Moreover, the BPR generally does not consider evidence of aggravating circumstances until the penalty phase of the disciplinary hearing. W.R.D.P. 15(b)(3)(C). Thus, evidence addressing whether an attorney is indifferent to making restitution or has not acknowledged the wrongfulness of his conduct should not be received until after the liability has been established. "[O]nce lawyers are found to have engaged in wrongdoing, they are expected to engage in a degradation ceremony by expressing remorse during the penalty phase of disciplinary proceedings. At this point, the disciplinary system expects and rewards unambiguous displays of contrition." Lesley Levin, *Bad Apples, Bad Lawyers or Bad Decision-making: Lessons from Psychology and from Lawyers in the Dock*, 22 Geo.J.LegalEthics 1549, 1581 (2009) (footnotes omitted) (reviewing Richard L. Abel, *Lawyers in the Dock: Learning from Attorney Disciplinary Proceedings* (2008)). *See also, Matter of Herron,* 441 P.3d 24, 40 (Kan. 2019) (Although the respondent refused to acknowledge his misconduct, the hearing panel was mindful of his argument that he was permitted to make a rigorous defense.).

---

[12] We recognize that Mr. Hinckley's counsel presented limited evidence of the settlement negotiations during Mr. Hinckley's testimony in the liability phase. Thus, it could be argued he opened the door to admission of that evidence. However, there was no discussion of the evidentiary question in the Report and Recommendation or during the disciplinary hearing, so we do not know the Bar's or the BPR's stance on the matter. Our separate review of the transcript shows any settlement discussions were not relevant to either part of the case.

**Mitigating Factors**

[¶98] The record supports finding that Mr. Hinckley did not have a prior disciplinary record and was cooperative during the disciplinary proceeding. ABA Standard 9.32(a) and (e). As explained above, the evidence also established that he displayed remorse for his actions. ABA Standard 9.32(l).

## DISCIPLINARY ORDER

[¶99] The responsibility of this Court in disciplinary proceedings is not to punish, but to determine a lawyer's fitness to practice law for the protection of the public, the courts and the legal profession. Applying the ABA Standards, the presumptive sanction for each of Mr. Hinkley's violations of the rules of professional conduct is suspension. Taking into account the aggravating and mitigating circumstances, we conclude this is a proper level of sanction. However, given the number of violations, the effects of Mr. Hinckley's conduct on the underlying case, and Mr. Hinckley's knowing state of mind, the term of the suspension should be significant. We, therefore, suspend Mr. Hinckley from the practice of law for a period of three years from the date of the BPR hearing. So ordered.

**FOX, Chief Justice,** concurring in part and dissenting in part, in which **DAVIS, Justice,** joins.

[¶100] I write separately because clear and convincing evidence supports the BPR's finding that Mr. Hinckley violated Rule 1.3 in all manners charged, and that he misrepresented facts to the district court in violation of Rule 3.3(a). I also believe the BPR's recommended sanction of disbarment was warranted, and I would impose that sanction. I therefore respectfully dissent from the majority opinion's holdings to the contrary.

[¶101] Before turning to the evidence of Mr. Hinckley's Rule 1.3 and 3.3(a) violations, I must first comment on what seems to be at least an intimation in the majority opinion that the charging document in this case did not contain the clarity and particularity required by our disciplinary rules and due process. I find no basis for that suggestion.

[¶102] Due process requires that a licensee receive reasonable notice of the charges against him. *Penny v. State ex rel. Wyo. Mental Health Professions Licensing Bd.*, 2005 WY 117, ¶ 51, 120 P.3d 152, 175 (Wyo. 2005). The charging document in this case contained twenty-seven pages of factual allegations that led to the multiple charges of rule violations against Mr. Hinckley. The charged rule violations then identified the specific rule violated and tied the violations to the factual allegations with sufficient particularity to advise Mr. Hinckley of the factual basis for the charges, and to satisfy the requirements of W.R.D.P. 13(a). That Mr. Hinckley at no time complained of a lack of notice or moved for a more particular statement of the charges is evidence of their sufficiency.[13]

---

[13] The case the majority relies on as an example of a deficient notice is easily distinguishable. In *Slagle v. Wyoming State Bd. of Nursing*, 954 P.2d at 981, the Board filed a complaint against Slagle, a nurse practitioner, for treating a class of patients she allegedly was not licensed to treat. Following a hearing, the Board suspended Slagle's license for violating a cease-and-desist order and submitting untruthful information in her license application, neither of which had been included in the notice of charges. *Id*. Not surprisingly, we held that a suspension based on allegations that were not charged violated her right to due process. *Id*. at 982-83. The charging document in this case presents no such concerns because it put Mr. Hinckley on notice of the charges against him, which is the focus of a due process inquiry. For example, in another case, the Board of Chiropractic Examiners suspended a chiropractor's license based on its finding that he "inserted his own affection into the therapeutic treatments he provided." *In re Greene*, 2009 WY 42, ¶ 18, 204 P.3d 285, 292 (Wyo. 2009). Dr. Greene claimed a due process violation based on a lack of notice of that allegation, and we rejected his claim. We said:

> Although the disclosures to Dr. Greene did not allege that he "inserted his own affection into his treatment" of SS, they did allege that he hugged and kissed SS, moaned, and touched her breast during his treatment. Given that these actions were the basis for the Board's determination that he inserted his own affection into treatments, we find no due process violation.

*Id.* at ¶ 24, 204 P.3d at 293. In this case, the charging document informed Mr. Hinckley of the precise rules violated and the factual allegations underlying those charges. Nothing more was required.

45

*I.*     *Clear and Convincing Evidence Established That Mr. Hinckley Violated Rule 1.3 When He Failed to Respond to the Motion to Compel and the Motion to Restrict Witness Testimony*

[¶103] The record supports the BPR's conclusion there was clear and convincing evidence that Mr. Hinckley violated Rule 1.3 when he failed to respond to the defense motion to compel and its motion to restrict testimony in the Black trial. The majority's focus on whether a rule or court order required a response to either motion is misplaced. First, nothing in Rule 1.3 suggests that a lack of reasonable diligence can be found only if a lawyer fails to comply with a mandatory requirement. Second, the charges against Mr. Hinckley were not based on an alleged violation of a rule or court order. The charging document alleged:

> Hinckley violated Rule 1.3 by failing to file a response to defendant's motion to compel, failing to file a response to defendant's motion to restrict testimony and failing to comply with the Court's deadline for filing witness and exhibit lists and jury instructions. In the post-remand phase, Hinckley was chronically late in responding to motions. Rule 1.3 provides, "A lawyer shall act with reasonable diligence and promptness in representing a client." Hinckley also failed in his duty of diligence by failing to perform an adequate investigation regarding the availability of Facebook and Verizon records before he made representations on those subjects to the Court, which the Court relied upon in denying Black's motion to restrict testimony as the appropriate sanction for Hinckley's discovery misconduct.

[¶104] Rule 1.3 requires an attorney to act with reasonable diligence. In determining whether to respond to a motion, a diligent attorney must of course consider the circumstances, but Judge Day's comments during the Black case illustrate how important a response can be. He cautioned that "[i]t's bad medicine not to respond to motions." He further explained that it handicaps the court because the court does not know the State's position ahead of hearings, and it invites the opposing party to ask that arguments not be considered. While those comments came much later in the case, and after Mr. Hinckley's failure to respond to the motions to compel and restrict testimony, they reflect a truth that an experienced attorney should understand.

[¶105] The circumstances surrounding the motion to compel show that it warranted a response. The preparation of a written response likely would have focused Mr. Hinckley on the law and where the parties stood in terms of discovery. He also would have likely better understood his obligations with respect to the requested materials, their availability, and his investigators' position on the request. In other words, he would not have been

winging it during the hearing on the motion, and he could have better informed the district court of what was in the State's possession, what had been provided versus what was being requested, and what was available from Facebook and Verizon. Mr. Hinckley's own expert testified to similar effect:[14]

> I think if I blame Becket for one thing, it would be –
> Mr. Hinckley – it would be not reaching out to somebody like
> Mr. Leazenby or maybe his DCI folks or something like that
> and find out what the heck they could do before he went to that
> hearing and file a response in accordance.

[¶106] I would reach the same conclusion concerning Mr. Hinckley's failure to respond to the motion to restrict testimony in the Black trial. Again, no rule or order required Mr. Hinckley to respond to the motion, but Judge Day's observation regarding the need for a response holds true here as well. That is particularly the case where the motion concerned an ongoing discovery dispute and sought to restrict the testimony of law enforcement and the victim—the only eyewitness and the State's key witness. As Judge Day pointed out, the sanction "would eviscerate the State's case." Given the importance of the motion, reasonable diligence demanded a response.

[¶107] I do not suggest that an attorney is required to respond to every motion for fear of violating Rule 1.3. It is fair to look at diligence in the context of a particular case, and it is fair to expect a diligent attorney to weigh which motions require a response and which may not. In the circumstances of this case, reasonable diligence required a response to both the motion to compel and the motion to restrict testimony.

## II.   *Clear and Convincing Evidence Showed That Mr. Hinckley Misrepresented Facts to the District Court in Violation of Rule 3.3(a)[15]*

[¶108] The BPR did not parse Mr. Hinckley's statements and consider them individually to determine whether clear and convincing evidence showed each to be a knowingly false

---

[14] The majority opinion acknowledges this testimony but notes that the expert did not link Mr. Hinckley's lack of preparation to a violation of Rule 1.3. The lack of such a linking is not surprising. We have held that applying the rules to determine whether there has been a rule violation is a task for the Board and this Court. *Bd. of Pro. Resp. v. Stinson*, 2014 WY 134, ¶ 66, 337 P.3d 401, 419-20 (Wyo. 2014). We expect expert opinions to provide information that is helpful to the determination of whether a rule has been violated, not the determination itself. *Id.* That is what Mr. Hinckley's expert did.

[15] I agree with the majority that this Court should not consider the seventh statement in the list of nine statements on which the Rule 3.3(a) violation was premised. The statement was one the Teton County Sheriff made while testifying concerning his knowledge of Mr. Hinckley's efforts to obtain the Facebook and Verizon records. He testified that Mr. Hinckley "mentioned that he contacted some representative of Facebook." Mr. Hinckley acknowledged during the hearing before the BPR that that statement was inaccurate, that he had not contacted Facebook, and that he should have corrected the record on that. That

47

statement, and I believe it is a mistake for this Court to do so. I do not agree that because our rules require specific pleadings, each misstatement must be individually dissected and analyzed. By taking this approach, the majority opinion misses the forest for the trees and defeats the purpose of the rule requiring candor toward a tribunal. A lawyer is not supposed to allow a court to be misled. *See* Rule 3.3 Comment 2 ("[T]he lawyer must not allow the tribunal to be misled by false statements of law or fact or evidence that the lawyer knows to be false."). That obligation demands more than avoiding an express lie; if it were otherwise, candor would be a very narrow and limited requirement. As one treatise observes:

> Rule 3.3, titled, "Candor Towards the Tribunal," brings together several different rules that focus on this duty of the lawyer as advocate. When a lawyer deals with a tribunal, in some very important respects, he or she must do more than merely tell the truth. Instead, the litigator must be "candid," *i.e.*, frank, without guile, aboveboard, straightforward. Although lawyers have the duty not to lie to their opponents, the title of Rule 3.3 advises that lawyers have a higher duty to judges, the duty to be candid. . . .

Ronald D. Rotunda & John S. Dzienkowski, *Legal Ethics—The Lawyer's Deskbook on Professional Responsibility* § 3.3-1 (July 2021 update) (footnote omitted).

[¶109] Mr. Hinckley denied that he intended to misrepresent his efforts to obtain the Facebook and Verizon records, or to mislead Judge Day into believing that he had contacted Facebook and Verizon, and his expert opined that Judge Day was not so misled. I can agree that Judge Day was not misled into believing that Mr. Hinckley had contacted Facebook and Verizon. What the record shows, however, with clear and convincing evidence, is that Mr. Hinckley intentionally misled Judge Day into believing that he had made a good faith effort to comply with his order.

[¶110] Taken together, Mr. Hinckley's representations to the court suggested that he tried everything he could to get the Facebook and Verizon records, including seeking F.B.I. assistance, requesting that his law enforcement team obtain them, and pressuring his law enforcement team to comply with Judge Day's order. The record reflects something different.

[¶111] F.B.I. Special Agent Jim Bonich testified that he and Mr. Hinckley talked on the street one day about recovering deleted content from Facebook. He further testified that

---

failure to correct the record implicated Rule 3.3(a)(3), which requires a lawyer to take reasonable remedial measures to correct false evidence offered by a witness called by him. Mr. Hinckley was not charged with violating Rule 3.3(a)(3), and presumably for that reason, the BPR found no violation of that provision.

while he is available to help the County when requested, he was not asked to help in contacting Facebook in the Black case. Teton County Sheriff James Whalen testified that he did not know there was a court order to obtain the Facebook and Verizon records. He further testified that he recalled one of his sergeants complaining about the request, and that Mr. Hinckley's position when they talked about it was that the records did not exist.

> And we spoke briefly about, you know, what our role is in terms of doing the defense attorney's work. We actually talked quite a bit about that, whether or not we were crossing any lines in terms of, you know, what our role is in a frankly adversarial process that's fundamental to the criminal justice system by doing the defense attorney's work.
>
> And so we talked about that, but that really didn't seem to be the essence of that conversation. The essence of it was that [Mr. Hinkley] had done some research and found out that those records just do not exist.

[¶112] Mr. Hinckley testified that he understood what Judge Day's order required of him.

> Q. And on page 3, Judge Day ordered you to – and I'm going to read this verbatim – "exercise due diligence to obtain the requested information and shall promptly request the information from Facebook and Verizon Wireless and provide it to defendant's counsel."
>
> A. I see that.
>
> Q. I read that correctly?
>
> A. Yes.
>
> Q. There's nothing ambiguous about that, is there?
>
> A. No.
>
> Q. The Court is ordering you to go to Facebook and Verizon and get the information from them?
>
> A. Correct.
>
> Q. And you knew on that day when you received the order, that all you needed to do was call the SO, ask them to get the

search warrants out, give them a copy of the order and say, "We've got to do this. The judge has told us to do it." Correct?

A.      Correct.

[¶113] Mr. Hinckley also testified that he had a good working relationship with the Teton County Sheriff's Office. Concerning his ability to direct law enforcement to apply for a search warrant, he testified:

Q.      You can direct law enforcement to issue search warrants.

A.      Well, I'm not going to concede that point.

Q.      You can't?

A.      I can ask them to do it, correct.

Q.      And they've never turned you down?

A.      That's correct.

[¶114] Nonetheless, Mr. Hinckley did not promptly ask his law enforcement team to apply for search warrants for the Facebook and Verizon records, and nor did he tell them that the court had ordered that it be done. Instead, he made comments to his team that suggested that any such request for records was futile.

[¶115] To then tell the court: "I did exactly what [the court] ordered me to do"; "I made the request of the entities that deal with it"; "I'll make another formal verbal request"; "obviously the State's done everything it can"; and "We tried every way to get those deleted phantom messages" is nothing short of dissembling. That is particularly the case when the representations are couched in statements that suggested law enforcement was refusing to comply with an order that Mr. Hinckley knew they had not seen—statements such as: "Am I supposed to go down there and beat the Sheriff over the head with a bat?" and "[Y]ou know, what do I do down there, arm wrestle them?" Mr. Hinckley's representations do not reflect the candor to a tribunal that we must expect and demand of our attorneys. *See In re Liotti*, 667 F.3d at 429 ("Even the slightest accommodation of deceit or a lack of candor in any material respect quickly erodes the validity of the process.").

[¶116] That Judge Day was misled by Mr. Hinckley's representations is reflected in his order denying defense counsel's motion for sanctions. In Mr. Black's appeal from his first conviction, this Court found that Judge Day erred in that ruling and that the decision "was

50

based on the unsupportable premise that the State acted in good faith when it failed to comply with the discovery order." *Black*, 2017 WY 135, ¶ 24, 405 P.3d at 1054. We further found "no factual support" in the record for the court's conclusion that the State had "complied with the spirit of the Court's Order, if not the letter of it." *Id.* at ¶ 25, 405 P.3d at 1054. Plainly, Mr. Hinckley's representations to Judge Day gave him an impression of Mr. Hinckley's efforts that are wholly unwarranted by the record.

[¶117] It is obvious from the BPR's findings that it weighed Mr. Hinckley's credibility and rejected his testimony that he misspoke when he made the cited representations, that he was truly frustrated in his efforts to obtain the Facebook and Verizon records, and that he felt he was being truthful when he expressed those frustrations to Judge Day. A review of the record supports the BPR's view of Mr. Hinckley's testimony, and we should therefore give its view of the evidence the consideration it is due. *See* Majority Opinion at ¶ 4.

[¶118] First, the record shows that obtaining the warrants was not a difficult task. The county attorney removed Mr. Hinckley from the Black case on or about June 26, 2018. On June 28, 2018, a search warrant was obtained for the Facebook records, and on July 6, 2018, one was obtained for the Verizon records. Additionally, as the majority notes in its review of aggravating factors, Mr. Hinckley's statements to the district court concerning the status of the search warrants reflected a dishonest motive. *See* Majority Opinion ¶ 92.[16]

[¶119] For these reasons, even if I were to parse Mr. Hinckley's statements, I would still conclude that clear and convincing evidence supported the BPR's finding that Mr. Hinckley violated Rule 3.3(a). Given Mr. Hinckley's deceit throughout the Black matter, the BPR was clearly unwilling to give him the benefit of the doubt in analyzing his statements that led to the charge that he violated Rule 3.3(a), and I do not believe this Court should do so either. For example, he told Judge Day, "I did exactly what [the court] ordered me to do, but we don't have it." Mr. Hinckley admitted before the BPR that he made that statement and that it was not true, but he testified it was not the way he intended it. The majority opinion accepts that explanation. *See* Majority Opinion ¶ 45(1). The BPR did not find Mr. Hinckley or his explanation credible; nor do I.

[¶120] Another example is Mr. Hinckley's statement to Judge Day, "I made the request of the entities that deal with it . . . . So, if you order it, I'll give it another whirl." Before the BPR, Mr. Hinckley testified that he was not trying to give Judge Day the impression he reached out to Facebook and Verizon but then stated, "I don't have an answer for you."

---

[16] The record also contains other instances of dishonesty that reflect on Mr. Hinckley's veracity and detract from his credibility. For example, an issue that arose early in the Black case was the hospital's destruction of a blood sample drawn from the victim for toxicology testing. Mr. Hinckley testified that he knew of the sample's destruction, and he admitted that he lied to opposing counsel about it when he requested a copy of the toxicology report. When the issue of the toxicology report came up again in a pretrial hearing, Mr. Hinckley again misrepresented the existence of the report and failed to disclose the blood sample's destruction.

*See* Majority Opinion ¶ 45(2). The BPR again plainly did not find Mr. Hinckley credible and therefore did not accept his testimony that he did not intend to mislead Judge Day. That is understandable. Even if the entities Mr. Hinckley was referring to in that statement were law enforcement entities, we know from the sheriff's testimony that Mr. Hinckley did not request that law enforcement obtain warrants and in fact downplayed the importance of the court's order by suggesting that the records did not exist. The record supports the BPR's conclusion that Mr. Hinckley was not being candid with the court when he said he made a request of the entities.

[¶121] In another of the charged statements, Mr. Hinckley told Judge Day, "So when there are – when there were discovery issues, obviously the State's done everything it can to try to remedy that." The majority looks to the context of this statement, limits it to the Verizon records, and accepts Mr. Hinckley's testimony before the BPR that he "just misspoke." *See* Majority Opinion ¶ 45(5). While this Court makes the ultimate judgment in these cases, I do not believe that this conclusion gives the BPR findings the consideration they are due. The BPR plainly did not find Mr. Hinckley's explanation credible, and the record supports that view. Whether Mr. Hinckley was referencing the Verizon records, the Facebook records, or both, we know that he had not done everything he could to obtain the records. In fact, he had done the opposite by suggesting to law enforcement that the records did not exist and by failing to show officers the court's order requiring that the State obtain the records.

[¶122] Finally, there are Mr. Hinckley's statements that he had the F.B.I. help him and tried every way to get the deleted "phantom messages." The majority opinion concludes that these statements were not dishonest but just a different interpretation of the term "help" and a reference to the measures Mr. Hinckley had in fact taken to obtain the records. *See* Majority Opinion ¶ 45(8). I again do not believe that the record supports ignoring the BPR's conclusion to the contrary. Agent Bonich's testimony reflected that he understood what it meant to help local law enforcement with a records request of this type, and he testified he was not asked to help in the Black case. Mr. Hinckley himself admitted he understood that what he needed to do to comply with Judge Day's order was to ask law enforcement to obtain search warrants, and he testified that he could have done that. The BPR was plainly unwilling to afford Mr. Hinckley's statements to Judge Day an innocent explanation when the clear and convincing evidence showed that they simply were not true, and this Court should not do so either.

[¶123] The record supports the BPR's conclusion that Mr. Hinckley violated Rule 3.3(a) by knowingly making false statements to the court concerning his efforts to obtain the Facebook and Verizon records and allowing Judge Day to be misled by those statements.

### III.    *The Court Should Accept the BPR's Recommendation That Mr. Hinckley Be Sanctioned with Disbarment*

[¶124] Before turning to the sanctions, I first take issue with the majority opinion's conclusion that the BPR erred in allowing testimony concerning settlement negotiations during the violations phase of the hearing. *See* Majority Opinion ¶ 96. In *BPR v. Stinson*, this Court held that the BPR is responsible for ruling on the admissibility of evidence, and its rulings will be reviewed for an abuse of discretion. 2014 WY 134, ¶ 57, 337 P.3d at 416. We explained:

> [T]he Disciplinary Code has structured disciplinary proceedings so it is the Board that hears evidence in the first instance and compiles the record. As part of that division of duties, the Disciplinary Code authorizes the Board, through either a disciplinary judge or the Board chair, to rule on evidentiary matters in accordance with the Wyoming Rules of Evidence. *See* Disciplinary Code §§ 8(g)(vi), 9(b)(iii), 19(b). In performing this function, the Board is called upon to exercise the same discretion that a trial court exercises in ruling on the admissibility of evidence. Given the structure of our attorney disciplinary proceedings, the division of functions between this Court and the Board, and the discretion the Board must necessarily use in ruling on the admissibility of evidence, we see no reason to deviate from our abuse of discretion standard of review.

*Id.*

[¶125] Mr. Hinckley did not object to the admissibility of the testimony concerning settlement negotiations, and in fact his attorney was the first to ask Mr. Hinckley questions about it. Under such circumstances, it is difficult to see how we could find that the BPR abused its discretion in allowing the testimony. *See Garriott v. State*, 2018 WY 4, ¶ 62, 408 P.3d 771, 790 (Wyo. 2018) ("[A] party 'may open the door to otherwise inadmissible testimony when he inquires about a particular subject.'") (quoting *Singer v. Lajaunie*, 2014 WY 159, ¶ 37, 339 P.3d 277, 287 (Wyo. 2014)). Additionally, there is no indication in the BPR's report and recommendation that it considered the settlement negotiations in the violations phase of its findings. I would therefore find no error in allowing the testimony, and as the majority opinion acknowledges, such evidence is properly considered in the sanctions phase of a disciplinary proceeding. *See* Majority Opinion at ¶ 96; *see also* W.R.E. 408 (evidence of statements made in settlement negotiations admissible if offered for purpose other than to prove liability or validity of claim); *In re Disciplinary Action Against Landon*, 600 N.W.2d at 859 (settlement evidence admissible when not offered to prove violation).

[¶126] I will turn then to the sanctions and the violations for which I believe the factors weigh in favor of disbarment.

53

## A. Mr. Hinckley's Violations of Rule 1.3 Warrant the Sanction of Disbarment

[¶127] The majority opinion rejects the BPR's finding that Mr. Hinckley's violations of Rule 1.3 "caused serious or potentially serious injury to the client," and it therefore also rejects the recommended sanction of disbarment. *See* Majority Opinion at ¶ 83. I believe clear and convincing evidence supports the finding that Mr. Hinckley's violations caused serious or potentially serious injury to the State, and I therefore would accept the recommended sanction of disbarment.

[¶128] In discussing the violations of Rule 1.3 that the majority found, it concluded that "Hinckley risked continuances and sanctions against the State," which put "his client's interests in jeopardy." *See* Majority Opinion at ¶ 23. I agree. Those sanctions included exclusion of key witness testimony and dismissal, which I believe were serious potential sanctions. Additionally, because I would find that Mr. Hinckley violated Rule 1.3 when he failed to respond to the defense motion to compel, I would conclude that Mr. Hinckley in fact caused serious damage to the State. The failure to respond to the motion to compel, with its attendant failure to be prepared for the hearing on the motion, led to an order that could have been avoided. The entry of that order, and Mr. Hinckley's failure to comply with it, started a cascade of events that eventually resulted in the reversal of Mr. Black's conviction. Under these circumstances, I believe that the Court must conclude that clear and convincing evidence supports a sanction of disbarment for Mr. Hinckley's violation of Rule 1.3.

## B. Mr. Hinckley's Violation of Rule 3.3(a) Warrants the Sanction of Disbarment

[¶129] Because I would find clear and convincing evidence that Mr. Hinckley violated Rule 3.3(a) by misrepresenting to the district court his efforts to obtain the Facebook and Verizon records, I believe the sanctions must address this violation. The presumptive sanctions for a violation of Rule 3.3(a) are found in ABA Standard 6.1, which states in relevant part:

> 6.1 False Statements, Fraud, and Misrepresentation
>
> Absent aggravating or mitigating circumstances, . . . the following sanctions are generally appropriate in cases involving conduct that is prejudicial to the administration of justice or that involves dishonesty, fraud, deceit, or misrepresentation to a court:
>
> > 6.11 Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or

54

improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding.

6.12 Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

6.13 Reprimand is generally appropriate when a lawyer is negligent either in determining whether statements or documents are false or in taking remedial action when material misinformation is being withheld, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

6.14 Admonition is generally appropriate when a lawyer engages in an isolated instance of neglect in determining whether submitted statements or documents are false or in failing to disclose material information upon learning of its falsity, and causes little or no actual or potential injury to a party, or causes little or no adverse or potentially adverse effect on the legal proceeding.

[¶130] Given the chasm between what Mr. Hinckley represented to Judge Day concerning his efforts to obtain the Facebook and Verizon records and what he was actually doing to obtain those records, I believe that the evidence is clear and convincing that Mr. Hinckley made those representations with an intent to deceive the court and to avoid sanctions. The evidence is also clear and convincing that his misrepresentations had a significant adverse effect on the legal proceeding. They resulted in an order denying sanctions that this Court found wholly unsupported by the record and the reversal of Mr. Black's first conviction. *See Black*, 2017 WY 135, ¶¶ 24-25, 405 P.3d at 1054. I therefore believe that the sanction of disbarment is appropriate for Mr. Hinckley's violation of Rule 3.3(a).

**C.     Mr. Hinckley's Violation of Duties Owed to the Legal System (Rules 3.2, 3.4(c), and 8.4(d)) Warrants the Sanction of Suspension**

[¶131] I agree with the majority that the record does not support a finding that Mr. Hinckley's violation of the order to obtain the Facebook and Verizon records was committed to obtain a benefit. Mr. Hinckley's failure to comply was based on his uninformed and misguided belief that the records did not exist. That does not excuse his violation, but the record does not suggest that he did it to keep the records from the defense and thereby gain some tactical advantage. I also agree with the majority's conclusion that the record does not support a conclusion that Mr. Hinckley intended to obtain a benefit through his trial misconduct. I therefore agree that these violations warrant a sanction of suspension.

## D.     Mr. Hinckley's Violation of Duties Owed to the Public (Rule 3.8(d)) Warrants a Sanction of Suspension

[¶132] This violation is again based on Mr. Hinckley's failure to comply with the order to obtain the Facebook and Verizon records. As I stated above, I agree with the majority that the record does not support a finding that Mr. Hinckley sought to obtain a benefit through his violation of that order, and I therefore agree that suspension is the appropriate sanction for this violation.

## E.     A Weighing of the Aggravating and Mitigating Factors Favors Disbarment as the Sanction for Mr. Hinckley's Multiple Rule Violations

[¶133] I agree with the aggravating factors found by the majority opinion, which included Mr. Hinckley's dishonest motive, his pattern of misconduct, his multiple offenses, and his substantial experience in the practice of law. I would add two additional factors: his refusal to acknowledge the wrongful nature of his conduct and his indifference to restitution.

[¶134] I do not read the indifference to restitution factor as being limited to BPR-ordered restitution.[17] I believe it refers to a lawyer's willingness to make restitution to a victim of

---

[17] The majority opinion rejected the BPR's finding that indifference to restitution should be an aggravating factor.

> [The BPR] determined Mr. Hinckley was indifferent to making restitution under ABA Standard 9.22(j) and refused to acknowledge the wrongful nature of his conduct under ABA Standard 9.22(g). The record does not support the BPR's finding that Mr. Hinckley was indifferent toward making restitution, as no restitution from Mr. Hinckley was requested or ordered. The BPR made no effort to explain how it was appropriate to assign that aggravating factor when it did not make a restitution order.

Majority Opinion at ¶ 93.

his misconduct. The record shows that Mr. Hinckley refused to be a part of any settlement between Mr. Black and Teton County if it involved making restitution to Mr. Black. In his view, Mr. Black "got a Christmas gift from my screw-ups." His counsel reiterated Mr. Hinckley's position during argument that the only victim of his rule violations was the abuse victim in the *Black* case.

> But yes, he had this period of time where he was not functioning as the gold standard or even other standards of a prosecutor. He acknowledged that. And all I'm saying is the reason we're here having you tell us what the discipline is is because every other talk of discipline has included money to Mr. Black. Okay? And, you know, whether it be articles in the paper, whether it be whatever, it was important for Mr. Hinckley to come here and maybe utter one line as to who he has harmed through all this. He's not telling you he hasn't harmed someone. But he also believes firmly that Mr. Black got a gift from this.

[¶135] The chairman of the BPR panel took issue with Mr. Hinckley's attitude toward his wrongdoing and his refusal to acknowledge that because of his misconduct Mr. Black's first trial was not a fair trial. After that, the following exchange occurred in which Mr. Hinckley purported to retreat from his repeated refrain that his misconduct was a gift to Mr. Black:

> [PANEL CHAIRMAN]: Do you understand there was damage done here to more than just the public and the judicial system?
>
> MR. HINCKLEY: Yes, sir.
>
> [PANEL CHAIRMAN]: There was damage done here to Mr. Black, whether you agree that he was guilty or not. He was entitled to certain process, and he didn't get it.
>
> MR. HINCKLEY: Absolutely, I agree with it, Your Honor.
>
> [PANEL CHAIRMAN]: What about that?

---

I question whether the indifference to restitution factor refers at all to BPR-ordered restitution. Restitution is a possible sanction once a violation is found and would thus be something included in the recommendation and report. ABA Standard 2.8(a). A lawyer would not have had an opportunity to be indifferent to BPR-ordered restitution at the time the aggravating and mitigating factors are weighed, so it seems unlikely that that is what the factor is referencing. I therefore disagree that the BPR had to have ordered restitution before it could consider whether a lawyer was indifferent to restitution.

MR. HINCKLEY:   He deserved, obviously, a process that I didn't award. I was sloppy or negligent. I do not contest that.

[PANEL CHAIRMAN]:   But I wonder if you realize that, and I wonder if you realize the import of that.

MR. HINCKLEY:   Absolutely, wholeheartedly. I really do. I can't say it any other way than that. That might be inartful. But I completely understand. I've been around the system a long time. Well, you know my history.

[¶136] Throughout the hearing before the BPR, Mr. Hinckley firmly maintained his stance that his misconduct was a gift to Mr. Black, and he defended his refusal to be a part of any settlement that would result in monetary restitution to Mr. Black. In finding that Mr. Hinckley's lack of remorse and indifference to restitution were aggravating factors in determining the appropriate sanction, the BPR apparently was not persuaded by Mr. Hinckley's last-minute change of heart. Nor am I. I conclude that the record supports treating these as aggravating factors in determining the appropriate sanction.

[¶137] As to the mitigating factors, I agree with the majority opinion that, although it was lacking in important respects, Mr. Hinckley did show some remorse and that remorse should be considered a mitigating factor. I also agree that his lack of a prior disciplinary record is properly considered as a mitigating factor.

[¶138] Given the number of rule violations, their severity and pattern, Mr. Hinckley's pervasive dishonesty, and the weighing of the aggravating and mitigating factors, I believe that the appropriate sanction is disbarment. I would therefore accept the BPR's recommended sanction.